# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **AXIALL CORPORATION**, | ) CIVIL ACTION NO. 15-250 |
| Plaintiff, | ) |
| v. | ) |
| **DESCOTE S.A.S. et al.**, | ) |
| Defendants. | ) |

## MEMORANDUM OPINION

### I. Introduction

Pending before the court are two motions to exclude expert testimony: the Motion to Preclude the Proffered Expert Testimony of Graeme Norval (ECF No. 86) filed by plaintiff Axiall Corporation ("Axiall") and the Motion to Exclude Certain Testimony of Plaintiff's Expert Mark Gleason and Gleason & Associates (ECF No. 89) filed by defendant descote S.A.S. ("descote"). The court heard oral argument on these and other motions on May 1, 2017. During the hearing, the court issued rulings on various aspects of the motions, which were memorialized in an order entered on May 15, 2017. (ECF No. 135). In addition, the court ordered the parties to file supplemental briefs on two discrete issues, on which the court reserved ruling: (1) "whether Norval's testimony regarding the management of change process is relevant to the issue of reliance under 18 Pa. Cons. Stat. § 2315 (Implied warranty: fitness for a particular purpose), and, in particular, whether section 2315 imposes a subjective or objective reliance requirement;" and (2) "whether 'the weighted average cost of capital' is the same as 'return on assets[.]'" (*Id.* at 2). The parties timely filed their supplemental briefs (ECF Nos. 131, 133) and responses thereto

(ECF Nos. 136, 137). The issues presented, having been fully briefed, are now ripe for resolution.

II. **Legal Standard**

Federal Rule of Evidence 702 provides that:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), district courts must act as gatekeepers to "ensure that any and all scientific testimony or evidence admitted is ... reliable." *Id.* at 589. While *Daubert* applied exclusively to scientific testimony, the Supreme Court subsequently extended the district court's gatekeeper function to all expert testimony. *Kuhmo Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999). The United States Court of Appeals for the Third Circuit has explained that Rule 702 "embodies a trilogy of restrictions" that expert testimony must meet for admissibility: qualification, reliability and fit. *Schneider ex rel. Estate of Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003).

III. **Discussion**

A. **Motion to Exclude Testimony of Graeme Norval ("Norval") regarding Management of Change**

Some background is necessary to place the parties' arguments about this issue in context. According to Norval's expert report, "[m]anagement of change (MOC) is one of the elements of

2

a Process Safety Management system." (ECF No. 86-1 at 4). It "is a process for evaluating and controlling modifications to facility design, operation, organization, or activities – *prior to implementation* – to make certain that no new hazards are introduced and that the risk of existing hazards to employees, the public, or the environment is not unknowingly increased" (*Id.*) (emphasis in original). As Norval explains in his report, "[c]ompanies and sites usually have written MOC procedures that apply to all work that is not judged to be an RIK (replacement in kind)." (*Id.*) "The principle behind MOC," he explains, "is that the operating chemical company has the most knowledge on the safe handling of its products. These companies need to follow due diligence principles when planning change." (*Id.*)

Later in his report, Norval opines:

> In my opinion, an MOC process should have been followed by AXIALL in connection with implementation of the new rail cars and new valve technologies. The case involves the use of a valve technology that had not been in use in North America (save for pneumatic trials 20 years prior), and a new valve supplier, neither of which can be considered as Replacement in Kind. Maintenance activities are generally outside the scope of MOC because the part is replaced by an identical part (Replacement in Kind). The decision to change from a 4-valve to a 3-valve, and then back to a 4-valve arrangement should have been part of this MOC process. The documentation requirements and the diligence of these engineering reviews, would have provided AXIALL with the information to evaluate the candidate valves for the various AXIALL locations, and to make a valve selection decision. AXIALL was responsible for following the MOC process.

(*Id.* at 15). In his summary section, Norval concludes, in part:

> AXIALL should have followed a Management of Change (MOC) protocol in the administration of this project. AXIALL had the responsibility to review and assess technological changes prior to their implementation; in this case, the technology change was the addition of a spring-loaded ball check valve on the underside of every valve. MOC protocols ensure that this is completed properly. It would have forced the documentation of the goals of the changed design, as well as a statement of the requirements, with a demonstration that the requirements could be met, prior to proceeding.

(*Id.* at 20).

In the supplemental briefing before the court, Axiall argues (as it did in its initial brief) that Norval's opinion regarding management of change contradicts the law about the implied warranties of merchantability and fitness for a particular purpose by, in effect, placing the obligation on Axiall instead of descote "to make sure that the valves it sold were merchantable and suitable for Axiall's needs." (ECF No. 136 at 6). descote counters that:

> Norval's Management of Change testimony will inform the jury's understanding of the chemical industry and usage of trade in that industry. This understanding, in turn, will prove helpful as the jury decides whether a seller like descote had "reason to know" that a buyer like Axiall was relying on descote's skill or judgment.

(ECF No. 133 at 5).

As an initial matter, the court notes that descote only addressed the admissibility of Norval's proposed testimony regarding management of change as it relates to Axiall's claim for breach of the implied warranty of fitness for a particular purpose. The court, therefore, must conclude that descote concedes that the proffered testimony is not relevant to Axiall's other claims and will confine its discussion to that claim, as well.

The implied warranty of fitness for particular purpose arises "[w]here the seller at the time of contracting has reason to know: (1) any particular purpose for which the goods are required; and (2) that the buyer is relying on the skill or judgment of the seller to furnish suitable goods[.]" 13 PA. CONS. STAT. § 2315. Accordingly, to establish a breach of this implied warranty, a plaintiff must prove three elements: "(1) The seller must have reason to know the buyer's particular purpose. (2) The seller must have reason to know that the buyer is relying on the seller's skill or judgment to furnish appropriate goods. (3) The buyer must, in fact, rely upon the seller's skill or judgment." *Gumbs v. Int'l Harvester, Inc.*, 718 F.2d 88, 92 (3d Cir. 1983) (citing J. White & R. Summers, HANDBOOK OF THE LAW UNDER THE UNIFORM COMMERCIAL

CODE 358 (2d ed. 1980)). "Whether or not this warranty arises in any individual case is basically a question of fact to be determined by the circumstances of the contracting." 13 PA. CONS. STAT. § 2315 cmt. 1. "[T]he buyer need not bring home to the seller actual knowledge of the particular purpose for which the goods are intended or of his reliance on the seller's skill and judgment, if the circumstances are such that the seller has reason to realize the purpose intended or that the reliance exists." *Id.*

With this background in mind, the court turns to the question whether Norval's proposed testimony regarding management of change is admissible to disprove that descote "had reason to know" that Axiall was relying on descote's skill or judgment in selecting suitable valves. The answer to the question must be "no" because there is a lack of fit between the proposed testimony and the issues in this case. *See Hartle v. FirstEnergy Generation Corp.*, No. CIV.A. 08-1019, 2014 WL 1117930, at *2 (W.D. Pa. Mar. 20, 2014) ("The Rule 702 requirement that testimony 'help the trier of fact to understand the evidence or to determine a fact in issue' is called the 'fit' requirement.").

The court disagrees with descote's contention that the management of change testimony will merely "inform the jury's understanding of the chemical industry and usage of trade in that industry." (ECF No. 133 at 5). If Norval's report ended at page four, when Norval explains in general terms what management of change is, there might be something to this argument.[1] But the report does not end there.

---

[1] Even if that were the case, the court would be unable to conclude that Norval's testimony actually rises to the level of trade usage. He states that "[c]ompanies and sites *usually* have written MOC procedures that apply to all work that is not judged to be an RIK (replacement in kind)." (ECF No. 86-1 at 4) (emphasis added). Nowhere, however, does he actually state that it is industry practice to implement a management of change process under circumstances like those here, such that descote could have reasonably expected such a procedure would be followed and, in turn, that Axiall was not actually relying on descote's skill and judgment in selecting the

5

On the contrary, the crux of Norval's report is that Axiall *should have* implemented a management of change process before switching valves. (ECF No. 86-1 at 15). The relevancy of that opinion is not supported by the record. The relevant evidence is what descote knew or had reason to know when it sold Axiall the valves – a question of fact about what Axiall *should have* done sheds no light. This testimony, for all intents and purposes, would place a burden on Axiall that is not consistent with the requirements of the implied warranty of fitness for a particular purpose. Allowing Norval to opine in this manner would run the risk of confusing the jury about the applicable legal standard, rather than helping it wrestle with the difficult issues it will face in deciding descote's liability.

The decisions on which descote relies do not convince the court otherwise. (ECF No. 133 at 3-4) (citing *Pompa v. Hart*, 15 Pa. D. & C. 4th 119 (Com. Pl. 1992); *Brantner v. Black & Decker Manufacturing Co.*, 831 F. Supp. 460 (W.D. Pa. 1993); *Varner v. MHS, Ltd.*, 2 F. Supp. 3d 584, 597 (M.D. Pa. 2014); *Stratos v. Super Sagless Corp.*, No.CIV.A. 93-6712, 1994 WL 709375, at *8 (E.D. Pa. Dec. 21, 1994)). descote contends that these decisions show that courts consider "industry norms . . . in deciding what a seller would objectively know about a buyer's reliance." (*Id.*). These decisions, however, do not support that argument. None of them actually

---

proper valves. His statement raises more questions than it answers. For example, why might a company not implement a management of change process? When does particular work amount to a "replacement in kind"? Who is responsible for making that determination? If the court were to allow Norval's testimony about management of change, then it would also have to allow the parties and the jury to delve into these ancillary issues. In effect, the court would have to conduct a mini-trial on management of change. That would be time-consuming and end up confusing the issues. Even if Norval's testimony about management of change satisfied the requirements of Federal Rule of Evidence 702 (it does not), the court could exclude it under of Federal Rule of Evidence 403. This conclusion does not impact the burden on Axiall to show that descote knew or had reason to know that Axiall was relying on it. descote will be able to respond to any evidence adduced by Axiall and present evidence about what it knew or had reason to know.

involve the kind of proffered expert testimony at issue here. They do not involve the use of "industry norms" to prove reliance or lack thereof. To the contrary, they support the general and uncontroversial proposition that the buyer must show that the seller had "reason to know" that the buyer was relying on the seller's skill and judgment in selecting suitable goods to recover for breach of the implied warranty of fitness for a particular purpose. As the court already made clear, it does not disagree with that proposition. Norval's testimony about what Axiall *should have* done, however, has no bearing on whether descote knew or had reason to know Axiall was relying on descote's skill and judgment.

For these reasons, the court will exclude Norval's management of change testimony insofar as it relates to Axiall's claim for breach of the implied warranty of fitness for a particular purpose. As the court previously ruled, however, Norval "will be permitted to testify about the background of the chlorine industry and how the implementation of a management of change process could have mitigated the extent of damages sustained by plaintiff Axiall." (ECF No. 135 at 2).

**B. Testimony of Mark Gleason and Gleason & Associates ("Gleason") regarding "Lost Opportunity Cost" Damages**

By way of background, Axiall seeks to recover "lost opportunity cost" damages, which it claims "represent the financial loss [it experienced] because the funds used to pay the additional out-of-pocket costs due to the failure of the descote valves and the ARI non-conforming pressure plates were not available for investment in its normal business operations." (Gleason Report at 14). Axiall claims that its lost opportunity costs can be measured based on its "internal cost of capital, or typical return on assets." (*Id.*). According to Gleason's report, Axiall's weighted average cost of capital ("WACC") is 11.1%, which, Gleason explains, "means that Axiall is able to invest its assets into projects for which it receives, on average, an 11.1% annual return." (*Id.* at

7

15). "[T]o calculate the damages due to this lost opportunity," Gleason "calculated the return that Axiall would have achieved on its resources from the time the various expenses were incurred, assuming [Axiall's] average return of 11% return on assets." (*Id.*)

In its initial brief, descote argued the Gleason's opinion regarding lost opportunity costs should be excluded because (1) it is speculative and not based on "reliable evidence developed or independently verified" by Gleason; and (2) it "improperly circumvent[s] prejudgment interest law." (ECF No. 98 at 5, 8).

Axiall countered in its initial response that it can recover lost opportunity costs as consequential damages. To support this proposition, Axiall cited *Draft Systems, Inc. v. Rimar Manufacturing, Inc.*, 524 F. Supp. 1049, 1054 (E.D. Pa. 1981), in which the court upheld an award of damages that included interest charges that the plaintiff incurred "'on the loans obtained by the plaintiff to avoid financial disaster during the period of repair and replacement of the malfunctioning dispensing devices.'" (ECF No. 101 at 9) (quoting *Draft Systems*, 524 F. Supp. at 1054 ("Similar awards of accrued interest for financing capital losses, however, have been properly sustained as an element of consequential damages.")). Axiall also cited *Carl Beasley Ford, Inc. v. Burroughs Corp.*, 361 F. Supp. 325, 334 (E.D. Pa. 1973), in which the court upheld an "award of interest charges incurred by the plaintiff for the purchase of the equipment at issue." (ECF No. 101 at 9-10). Analogizing to those cases, Axiall maintains that it "incurred damages by expending its own funds to repair and replace the defendants' defective goods." (*Id.* at 10) "It should make no difference," Axiall argued, "that [it] obtained the money to remedy the defendants' breach from its own funds, as opposed to obtaining the money from a bank and paying interest. Effectively, by using its own funds, Axiall lost a rate of return equal to its 2013 WACC. This is no different from making interest payments made [sic] to a bank on a

loan taken out to avoid capital losses." (*Id.* at 10).

Because the court was skeptical about whether WACC is an appropriate measure of Axiall's claimed damages, the court invited the parties to submit supplemental briefing – particularly to address the interplay between WACC and return on assets.

### 1. Lost Opportunity Costs as Consequential Damages

Before considering whether WACC is an appropriate measure of damages, the court must address the threshold question whether Axiall's lost opportunity costs are recoverable as consequential damages or whether prejudgment interest law should control, as descote contends.

Axiall cites two decisions, *Draft Systems* and *Carl Beasley Ford*, in support of its argument that its foregone returns on investments are consequential damages. Those decisions, however, are not exactly apposite here. In both of them, the injured party incurred actual interest charges, and there is no question that those payments are recoverable as consequential damages. *See* Roy Ryden Anderson, *Incidental and Consequential Damages*, 7 J.L. & COM. 327, 435 (1987) (explaining that "interest as consequential damages" "differs from pre-judgment interest in that it is not based on the amount the defendant ultimately owes but is itself an independent item of damage," which "usually takes the form of interest or finance charges that the buyer has incurred on borrowed money to finance the purchase of the defective goods or to repair them"); *Spreader Specialists v. Monroc, Inc.*, 752 P.2d 617, 623-24 (Idaho App. Ct. 1987) ("[I]nterest charges incurred on a loan obtained in good faith, as part of a reasonable course of action to mitigate losses, may be recovered as an item of consequential damages."); *Tookalook Sales & Serv. v. McGahan*, 846 P.2d 127, 130 (Alaska 1993) ("[T]hird-party finance charges are generally awardable as consequential damages.").

9

This case, however, presents a slightly different question: can an injured party recover lost opportunity costs as consequential damages when it uses its own funds to cover expenses occasioned by the breach instead of borrowing funds and paying interest? Axiall did not cite any decisions in which courts have allowed recovery of those damages, and the court's own research revealed a lack of clarity about the question.

"The economic concept of 'opportunity cost' has been used in a variety of cases as a loose label for any of a number of adjustments to value involving the idea that for every use of one's resources there is an alternative use, with its own return, foregone." *Fishman v. Estate of Wirtz*, 807 F.2d 520, 556 (7th Cir. 1986) (citations omitted). Some courts have concluded "that an opportunity cost is a real cost" to the injured party that can, for example, "be measured by the interest or profit that [the injured party] could have obtained from investing, or using elsewhere in its business, the money" that it spent to remedy losses occasioned by the breach. *Afram Exp. Corp. v. Metallurgiki Halyps, S.A.*, 772 F.2d 1358, 1369 (7th Cir. 1985) (citing *Simmons v. United States*, 698 F.2d 888, 898 (7th Cir.1983)). According to these courts, the forgone profit is considered a type of consequential damages. *See id.* at 1370 ("a forgone profit from exploiting a valuable opportunity that the breach of contract denied to the victim of the breach fits more comfortably under the heading of consequential damages than of incidental damages"); *Cole Energy Dev. Co. v. Ingersoll-Rand Co.*, 913 F.2d 1194, 1202 (7th Cir. 1990) (explaining that the plaintiff's "consequential damages would include the lost opportunity cost it incurred"); *Stamtec, Inc. v. Anson Stamping Co.*, 346 F.3d 651, 658 (6th Cir. 2003) (citing *Firwood Mfg. Co. v. Gen.*

*Tire, Inc.*, 96 F.3d 163, 169–71 (6th Cir. 1996)) (explaining that "damages based on either lost use of money or interest paid to a third party . . . represent consequential damages").[2]

In *Cole*, the Seventh Circuit Court of Appeals distinguished these kinds of damages from prejudgment interest. 913 F. 2d at 1202. The plaintiff in that case claimed that it suffered damages because the faulty equipment that it leased from the defendant delayed its ability to extract natural gas, which, in turn, also delayed the plaintiff's realization of profits on the sale of that gas. *Id.* at 1201-02. Hence, the plaintiff sought to recover interest for the period of time during which the profits were delayed. *Id.* The court determined that "[t]he cost to [the plaintiff] of not having money when it should have is not prejudgment interest, but an actual loss incurred by [the plaintiff]." *Id.* at 1202. The court explained:

> Although the allowance of prejudgment interest is intended to compensate a party for lost interest income over a period of time in which it was entitled to a certain sum of money but did not have use of it, that time period runs from the date of the breach to the date of the judgment. In this case, on the other hand, [the plaintiff] is seeking interest income forgone during the period from the date upon which it should have extracted the last cubic foot of gas to the date upon which it did extract the gas. Unlike the time frame involved in calculating prejudgment interest, [the plaintiff's] period is not defined by an intervening judgment.

*Id.*; *see also JGR, Inc. v. Thomasville Furniture Indus., Inc.*, No. 1:96CV01780, 2007 WL 275967, at *5 (N.D. Ohio Jan. 26, 2007) (explaining that "opportunity cost damages are not completely identical with prejudgment interest" but "are a type of consequential damages that may be awarded in breach of contract cases").

On the other hand, in *Gonzalez Production Systems, Inc. v. Martinrea International Inc.*, No. 13-CV-11544, 2015 WL 4771096 (E.D. Mich. Aug. 13, 2015), the court was "hesitant to

---

[2] The issue in these cases was whether the injured *seller* could recover damages for the "lost use of money." Under the Uniform Commercial Code, injured sellers may only recover incidental damages, not consequential damages. *Stamtec*, 346 F.3d at 658. The courts in these cases had to decide whether damages for the loss of use of money were incidental or consequential. *Id.*

11

permit over $8 million in consequential damages for the lost-use of funds when pre-filing interest is generally the element of damages to compensate for the lost use of funds." *Id.* at *14. Thus, the court rejected the plaintiff's attempt to recover for the lost use of funds as consequential damages and instead held that "damages for lost use of funds will be limited to the prejudgment interest for both" of the plaintiff's claims. *Id.*

descote, for its part, argues that Axiall is making a "thinly-veiled claim for prejudgment interest." (ECF No. 90 at 8). Citing to a handful of decisions, descote argues that courts "regularly reject" attempts to recover damages for lost opportunity costs as disguised attempts to recover prejudgment interest. descote, however, ignores the particular legal context in which those cases arose. A number of decisions addressing the interplay between prejudgment interest and recovery of lost opportunity costs, including one cited by descote, arose in the antitrust realm. *See In re Lower Lake Erie Iron Ore Antitrust Litig.*, 759 F. Supp. 219 (E.D. Pa. 1991). Because the Clayton Act precludes recovery of prejudgment interest, plaintiffs often try to disguise requests for prejudgment interest by arguing that they are truly seeking to recover lost opportunity costs as consequential damages. *See, e.g.*, *In re Linerboard Antitrust Litig.*, 504 F. Supp. 2d 38, 64 (E.D. Pa. 2007). Courts have largely looked beyond the form of the recovery sought, however, and recognized the disguised requests for what they really are: requests for prejudgment interest. *Id.*

The same issue has been addressed in cases involving the Federal Tort Claims Act ("FTCA"). *See*, *e.g.*, *S. Pac. Transp. Co. v. United States*, 471 F. Supp. 1186, 1197 (E.D. Cal. 1979). Like the Clayton Act, the FTCA precludes plaintiffs from recovering "interest prior to judgment" on claims against the United States. *Id.* at 1188 (citing 28 U.S.C. § 2674). In *Southern Pacific*, the plaintiff nonetheless argued that it could recover damages for its "loss of use of

capital" expended as a result of the United States' tortious conduct because that kind of damage was "factually and legally different from a claim for prejudgment interest." *Id.* Since it had to divert capital away from other planned projects, the plaintiff contended that it lost business opportunities that would have yielded a return. *Id.* at 1198. The plaintiff in turn sought to measure its damages based on the rate of return it would have realized on those other projects "because the required funding was utilized instead for expenditures related to the [United States' tortious conduct]" or its current cost of capital. *Id.* The court refused to recognize that kind of damage. *Id.* "The difficulty with this argument," the court explained, "is that the nature of interest cannot be changed by reference to the reason the capital was spent. In other words, the fact that the expenditure might have been occasioned by a need to mitigate damages does not alter the conclusion that a claim for compensation for the loss of use of that capital is a claim for interest." *Id.*

*Lake Erie* and the decisions like it, however, are not necessarily on point. In these cases, because the plaintiffs were prevented by law from recovering prejudgment interest, they tried to disguise their damages as something else. Here, however, there is no bar on recovering prejudgment interest.[3] Thus, the court need not be concerned with whether Axiall is attempting to disguise a "true" demand for prejudgment interest.

In view of the somewhat murky state of the law in this area, the court will assume that, at least in theory, lost opportunity costs may be recovered as an item of consequential damages and

---

[3] The other decisions on which descote relies for the proposition that "courts have [] recognized the equivalent nature between prejudgment interest claims and lost opportunity claims" are largely inapposite. The courts in those cases merely recognized that prejudgment interest is designed to compensate for lost opportunity cost or the time value of money. None of the decisions, however, dealt with the question whether lost opportunity costs can, in some cases, be recovered as a form of consequential damages.

not just as prejudgment interest in certain cases.[4] Nevertheless, the court is still not convinced that Axiall's WACC is an appropriate measure of its alleged damages.

## 2. Use of WACC to Measure Damages

The court expressed its concerns about using WACC to measure damages on the record at the *Daubert* hearing and gave Axiall an opportunity to try to persuade the court otherwise. To that end, Axiall attached an affidavit to its supplemental brief prepared by Douglas S. King ("King"), Vice President and Managing Director with Gleason & Associates. King elaborates on the concept of WACC. King explains that WACC, which comprises two components – the cost of a company's debt and the cost of its equity – "is the minimum expected rate of return that a business would be willing to accept to justify making an investment." (ECF No. 131-1 ¶ 4). "Generally contemporary corporate finance principles hold that companies *should* be making investments, either capital investments or acquisitions, such that the returns will exceed the cost of capital for the company so that the company is 'creating value.'" (*Id.* ¶ 5) (emphasis added). In other words, King explains, WACC represents "the rate of return that is sufficient for a company to meet its interest obligations and repay its debt principal, while also allowing for an equity return to the shareholders that is consistent with its type of business." (*Id.* ¶ 7). "Thus," King concludes, "the 11.1% may not represent the expected return for any one specific investment of Axiall, but rather a weighted average of the expected return for all of its assets." (Id. ¶ 11). "As such," Axiall argues, "it is the best approximation of what Axiall would have earned had it invested the money it lost as a result of the Defendants' conduct back into its operations." (ECF No. 131 at 2).

---

[4] Of course, "because opportunity cost damages do serve the same purpose as prejudgment interest, any additional award of prejudgment interest would overcompensate" the injured party and would not be recoverable. *JGR*, 2007 WL 275967, at *5.

The court remains unconvinced. Axiall did not cite authority for the novel proposition that its opportunity cost damages should be measured by its WACC. King's explanation notwithstanding, this argument is entirely speculative. Axiall did not point to anything that suggests that King was informed that Axiall's actual rate of return on assets was 11.1% – in other words, that it was actually investing its cash in projects that generated that rate of return, even on average. Instead, Axiall argues that, *in theory*, because of its cost of capital, it would not have made financial sense for it to make an investment *unless* it generated a rate of return of at least 11.1%. As King averred in his affidavit, Axiall should be making such investments. But there is nothing to suggest that King was informed that promising investment opportunities actually presented themselves to Axiall during the relevant timeframe, such that it was generating those returns. Indeed, in light of Axiall's SEC filings, which descote attached to its supplemental brief, it appears that Axiall held cash and did not invest all its cash into capital projects: the company had $166.5 million in cash and cash equivalents on hand as of December 31, 2013. This suggests the exact opposite of what Axiall seeks to prove, i.e., that such opportunities were not available, or, if available, Axiall did not take advantage of them. descote argues, "if [Axiall] had the opportunity to invest its money at an 11.1 percent rate of return, it could have done so regardless of the alleged 'out-of-pocket costs' required to remedy its losses." (ECF No. 137 at 4). Perhaps more to the point, if Axiall actually had such an investment opportunity, it could show that it obtained actual returns of 11.1% instead of speculating about what its losses were based on its WACC. While Axiall had the opportunity to show the opinion was relevant because the $6.5 million in alleged out-of-pocket losses was specifically targeted for investment, it did not do so.

Although the court recognizes that lost opportunity costs may be recoverable as an element of consequential damages in certain cases, Axiall did not provide a sufficient foundation

for Gleason to opine about WACC in this case. Accordingly, Gleason's testimony on this issue will be precluded. Axiall may, nonetheless, seek prejudgment interest on damages, if any, that it may eventually recover, and the court reserves ruling on the propriety of such a request at this time.[5]

**IV.     Conclusion**

For the foregoing reasons, the Motion to Preclude the Proffered Expert Testimony of Graeme Norval (ECF No. 86) will be GRANTED IN PART and the Motion to Exclude Certain Testimony of Plaintiff's Expert Mark Gleason and Gleason & Associates (ECF No. 89) will be GRANTED. To wit, Norval's testimony will be precluded insofar as he opines that Axiall should have implemented a management of change process because that testimony is not relevant to the issue whether descote knew or had "reason to know" that Axiall was relying on its skill or judgment in selecting suitable valves; and Gleason's testimony will be precluded insofar as it relates to the issue of lost opportunity cost damages and the use of WACC to measure that kind of damages. An appropriate order follows.

BY THE COURT,

Dated: June 16, 2017

/s/ JOY FLOWERS CONTI
Joy Flowers Conti
Chief United States District Court Judge

---

[5] Under Pennsylvania law, "prejudgment interest is awarded as a matter of right" whenever "[t]he disputed amount [is] specified in the contract or [can be] ascertained from the terms of the contract such that at the time of the breach, the breaching party can proffer a tender." *Cresci Const. Servs., Inc. v. Martin*, 64 A.3d 254, 265 (Pa. Super. Ct. 2013). "In all other circumstances, including an award of consequential damages, prejudgment interest is awarded as a matter of discretion." *Id.* (citations omitted).