IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA
PITTSBURGH

| | | |
|---|---|---|
| AXIALL CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | **2:15-CV-00250-LPL** |
| | ) | |
| vs. | ) | **ECF NOS. 268, 272, 276 & 278** |
| | ) | |
| DESCOTE S.A.S., and AMERICAN | ) | |
| RAILCAR INDUSTRIES, INC., | ) | |
| | ) | |
| Defendants. | ) | |

## <u>OPINION</u>

Pending before the Court are four motions for summary judgment:  (1) Axiall's motion for partial summary judgment against descote (ECF No. 268); (2) descote's motion for summary judgment against Axiall (ECF No. 272); (3) ARI's motion for summary judgment against descote (ECF No. 276) on descote's cross-claim for contribution and indemnity; and (4) ARI's partial motion for summary judgment against Axiall (ECF No. 278) on Axiall's breach of implied warranty claims.  For the reasons set forth below, the Court will:  (1) grant Axiall's motion for partial summary judgment against descote (ECF No. 268); (2) grant in part and deny in part descote's motion for summary judgment against Axiall (ECF No. 272) — granted as to Axiall's misrepresentation claims and denied in all other respects; (3) grant ARI's motion for summary judgment (ECF No. 276) as to descote's cross-claims against it; (4) and grant ARI's motion for partial summary judgment (ECF No. 278) as to Axiall's implied

warranty claims against it.   The Court will also dismiss ARI's cross-claims against

descote.

I.     **FACTS**[1]

This litigation arises out of a commercial transaction for the purchase of

manually operated dual angle valves ("MOVs" or the "descote 922 valves"),

manufactured by descote S.A.S. ("descote"), a French company with a principal place of

business in Feyzin, France, by Axiall Corporation ("Axiall"),[2] a manufacturer of

chemicals, including chlorine, at several plants in the United States and Canada.

(Stipulations, ¶¶ 1-2, ECF No. 304-18.)   Most of the chlorine sold by PPG, and now

Axiall, is transported to customers in railroad tank cars.   (Axiall Corp.'s Concise

Statement of Material Facts in Support of Motion for Partial Summary Judgment

("Axiall's CSMF") at ¶ 5, ECF No. 270 at 2; descote's Responsive Concise Statement of

Material Facts in Response to Axiall's Motion for Partial Summary Judgment

("descote's Resp. CSMF") at ¶ 5, ECF No. 308 at 2 (neither admitted or denying this

---

[1] As the parties are familiar with the background of this case, the Court has set forth
only the facts relevant to the pending summary judgment motions.  Facts that relate
only to a particular summary judgment motion will be discussed in the section on the
motion to which they relate.

[2] PPG Industries, Inc. ("PPG") spun off its commodity chemical business in January
2013, which subsequently merged with Georgia Gulf to form Axiall Corporation.
(Deutsch Dep. at 12:10-13, Axiall App. Ex. N, ECF No. 304-14 at 3.)

statement).)[3]  The chlorine is loaded into railroad tank cars through a valve system. (Axiall's CSMF at ¶ 6.)

FC Tech, LLC ("FC Tech"), which is headquartered in Baton Rouge, Louisiana, has held the" exclusive rights to buy and resell all descote-branded products from their factory in France for [intended sale in] the U.S. and Canada" since 2006.  (*Id.* at ¶4; Axiall's CSMF at ¶ 8, ECF No. 270 at 2.)  Mark Fucich is the president of FC Tech. (Stipulations, ¶5.)  FC Tech is one of the owners of descote.  (Axiall's CSMF at ¶ 10.)

Salco Products, Inc. ("Salco") is in the business of, among other things, distributing products used in railroad tank cars.  (Stipulations, ¶ 6.)  FC Tech and descote have an agreement with Salco in which Salco is the exclusive distributor of descote valves to the railcar industry in the United States and Canada.   (Richer Dep. at 61, ECF No. 308-1 at 11; Degutis Dep. at 20, ECF No. 308-1 at 13.)  In particular, Salco was the exclusive distributor in the United States and Canada for the descote 922 valves.  (Ex. A to descote's Resp. CSMF, ECF No. 308-1 at 1.)

American Railcar Industries, Inc. ("ARI") is engaged in the business of designing and manufacturing railcars, custom designed railcar parts, and other railcar industry products.  (*Id.* at ¶¶ 7-8.)

On October 29, 2007, Mark Fucich communicated with Julie Bart at PPG, Axiall's predecessor-in-interest, via email regarding the price of descote bellows seal chlorine angle valves that were available for purchase.   (ECF No. 285 at 109.)  In this email,

[3] For brevity purposes, where the responsive concise statement of material fact admits the opposing party's statement of fact, or neither admits or denies the fact, the Court will not cite to the responsive CSMF.

Fucich represented to Ms. Bart that "[t]his valve will carry a 100% descote warranty back (sic) by the factory." (*Id.*) Ultimately, PPG decided not to purchase these valves. (11/11/15 Fucich Dep. at 56, descote App., [ECF No. 308-1 at 5](#).)

Sometime thereafter, Frank Reiner of The Chlorine Institute[4] and Julie Bart from PPG approached Mark Fucich to ask if descote would manufacture a manually operated dual angle valve similar to one produced by a competitor, Midland, and this was the impetus for descote's decision to produce this valve (the descote MOVs). (11/11/15 Fucich Dep. at 51:2-7, 235:18-22, [ECF No. 304-1 at 13](#), 27.) When asked if a 100% descote warranty went with the descote 922 valves sold to PPG, Fucich stated that he "believe[d] that when a valve manufactured by descote is purchased by an end user in the United States for transportation or process, that that warranty applies." (Fucich Dep. at 56-57, [ECF No. 304-1 at 15-16](#).) Other than the sales to Axiall, descote has never sold its MOVs for chlorine service to another customer. (11/11/15 Fucich Dep. at 238-39, [ECF No. 304-1 at 29-30](#); Richer Dep. at 15, [ECF No. 304-8 at 3](#).)

On March 29, 2011, PPG purchased ten (10) retrofit kits, each of which contained, among other things, three descote MOVs, by submitting a purchase order to Salco. (Stipulations, ¶9.) In 2012, PPG either purchased, or directed ARI to purchase, railcar kits from Salco which collectively included a total of nine hundred (900) descote MOVs, for use in PPG's chlorine railroad tank cars. (Axiall's Add'l Mat. Facts in Opp'n to

---

[4] The Chlorine Institute is a trade association consisting of chlorine manufacturers, users, equipment suppliers, and railroads, which assist in regulating the safe production, distribution, and use of chlorine and other chemicals. (Stipulations, ¶ 21.) Axiall is a member of The Chlorine Institute; descote and ARI are "associate members." (*Id.*, ¶ 22.) The record does indicate that FC Tech held membership in the Institute.

descote's Mot. for Summ. J. (Axiall's Add'l Mat. Facts in Opp'n"), ¶ 64, ECF No. 303 at 24; descote's Resp. to Axiall's Add'l Mat. Facts in Opp'n at ¶64, ECF No. 319 at 27.) Ms. Bart requested that ARI install 600 of the descote MOVs for chlorine transportation on the 150 railcars it was manufacturing for PPG. (Bart Aff. dated 10/26/17, ¶29, ECF No. 204-19 at 5; descote's Resp. to Axiall's Add'l Mat. Facts in Opp'n at ¶71, ECF No. 319 at 30.) Salco also shipped a number of retrofit kits containing the descote MOVs to various locations for installation on Axiall's existing tank cars and for future installation at a later date. (Axiall's Add'l Mat. Facts in Opp'n"), ¶ 78, ECF No. 303 at 27; descote's Resp. to Axiall's Add'l Mat. Facts in Opp'n at ¶ 78, ECF No. 319 at 34.)

In August of 2013, a spring in the descote check valve located below the gas valve on car AXLX broke after three loadings. (Stipulations, ¶15.) Axiall informed descote of the problem and, in response, FC Tech was present on 10/29/13 on site and participated in the removal of the 922 and 926 parts and replaced all of the damaged parts. (Report dated 11/18/13 by Jean-Pierre Richer re: Descote Valves Failure on Chlorine Axiall Tank Cars ("descote Report"), Axiall App. Ex. U, ECF No. 304-21 at 4.) On 11/5/13, Fucich and Richer participated in a complete investigation of the four damaged valves. (*Id.*, ECF No. 304-21 at 4-5.)

In October of 2013, Axiall reported a second valve failure to descote. (*Id.*, ECF No. 304-21 at 5.) On 11/13/13, Fucich participated in a full examination of the four valve sets (926/922) at Watco along with representatives from ARI, SALCO, and Axiall. (*Id.*; Stress Eng'g Rept. Dated 12/4/13, Axiall App. Ex. R, ECF No. 270-1 at 157.) At the instruction of descote's president, Mr. Richer, FC Tech/Mark Fucich, on behalf of

descote, hired Stress Engineering to conduct a valve failure analysis, and the information was sent directly to the factory. (2/24/16 Fucich Dep. at 283:24-25 to 284:2-15, Axiall App. F, ECF No. 270-1 at 53-54; 11/11/15 Fucich Dep. at 256:3-16, Axiall App. Ex. D, ECF No. 270-1 at 43; Stress Eng'g Final Rpt., Axiall App. Ex. R, ECF No. 270-1 at 154-202.) On December 2, 2013, Stress Engineering issued a draft report to Mark Fucich. (Stipulations, ¶16.) Subsequently, Mr. Richer instructed Fucich to direct Stress Engineering to delete the last two sentences on page 10 of its draft report. (2/24/16 Fucich Dep. at 288, Axiall App. Ex. F, ECF No. 270-1 at 55; Fucich email to M. Bartel dated 12/4/13, Axiall App. Ex. JJ, ECF No. 304-36 at 2.) Stress Engineering issued its final report to FC Tech on December 4, 2013. (Axiall App. Ex. R, ECF No. 270-1 at 154-202.) Following the issuance of that report, Axiall engaged Stress Engineering to conduct further analysis. (Stipulations, ¶ 17.)

Unable to reach a resolution of the various issues, Axiall commenced this civil action on February 24, 2015 against descote and ARI. Axiall has asserted four claims against descote: (1) breach of express warranty (Count I); (2) breach of implied warranty of merchantability (Count II); (3) breach of implied warranty of fitness for a particular purpose (Count III); and (4) misrepresentation (Count IV). (Am. Compl., ECF No. 9.) In addition, Axiall has asserted four claims against ARI: (1) breach of contract (Count V); (2) breach of express warranty (Count VI); (3) breach of implied warranty of merchantability (Count VII); and (4) breach of implied warranty of fitness for a particular purpose (Count VIII). (Id.) Descote has filed a cross-claim against ARI

for contribution or indemnity (ECF No. 15 at 10).  ARI has filed a cross-claim for contribution and/or indemnity against descote (ECF No. 20 at 18).

Discovery has been completed and Defendants have moved for summary judgment on some or all of the claims and cross-claims asserted against them.  In addition, Axiall has moved for partial summary judgment on the issue of agency.  The motions have been fully briefed and are now ripe for disposition.

## II.    STANDARD OF REVIEW

Summary judgment is appropriate if, drawing all inferences in favor of the nonmoving party, "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c).  Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's case, and for which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

More specifically, the moving party bears the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact.  Once that burden has been met, the nonmoving party must set forth "specific facts showing that there is a genuine issue for trial" or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. *Matsushita Elec. Indus. Corp. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting FED. R. CIV. P. 56(e)) (emphasis added by *Matsushita* Court).  An issue is genuine only "if the evidence is

such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

III.    **DISCUSSION**

    A.    **AXIALL'S MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST dESCOTE**

Axiall has moved for partial summary judgment on the issue of whether, as a matter of law, Mark Fucich and/or FC Tech were descote's agents at all times material in soliciting, and consummating the agreement to purchase descote's valves with, PPG, Axiall's predecessor.   Specifically, Axiall seeks a determination from this Court that FC Tech and Mark Fucich are descote's agents based on the following theories:  (1) descote's counsel has made binding judicial admissions that FC Tech and Mark Fucich are its agents; (2) the evidence of record clearly demonstrates that FC Tech and Fucich acted as descote's apparent agents; and (3) descote is estopped from disavowing FC Tech and Fucich as its agents as a matter of law.  In response, descote disputes that it made a judicial admission that FC Tech/Mark Fucich were agents of descote with regard to the transaction at issue, as well as Axiall's conclusion that FC Tech and its president, March Fucich, are now or were ever its actual agents, or had apparent authority to act as descote's agents.  descote also disagrees with Axiall's interpretation of the record evidence.   The Court will address each of Axiall's arguments seriatim.[5]

---

[5] Both parties cite to a number of federal and state cases applying Pennsylvania law in support of their positions.  Thus, on the issue of agency, it appears that the parties agree that Pennsylvania law applies.  Accordingly, the Court will analyze this issue under Pennsylvania law.

1.    **Judicial Admission of Agency**

Initially, Axiall argues that descote has made a judicial admission that Mark Fucich and FC Tech are its agent.   To constitute a judicial admission under Pennsylvania law, the statement must be "'an express waiver made in court or preparatory to trial by a party or his attorney, conceding for the purposes of trial, the truth of the admission,' and may be contained in pleadings, stipulations and other like documents." *Sherrill v. W.C.A.B.*, 624 A.2d 240, 243 (Pa. Commw. Ct. 1993) (quoting *Jewelcor Jewelers & Distributors, Inc. v. Corr*, 542 A.2d 72, 75 (Pa. Super. Ct. 1988), *petition for allowance of appeal denied*, 524 Pa. 608, 569 A.2d 1367 (1989).  *See also Parilla v. IAP Worldwide Serv., VI, Inc.*, 368 F.3d 269, 275 (3d Cir. 2004) ("Judicial admissions are formal concessions in the pleadings, or stipulations by the party or its counsel, that are binding upon the party making them.") (quoting *Keller v. United States*, 58 F.3d 1194, 1198 n. 8 (7th Cir. 1995)).   A critical element of a judicial admission "is that it has been made for the advantage of the admitting party and once the admission has been made, the party making it is not allowed to introduce evidence attempting to disprove it."  *Id.* (citing *Jewelcor Jewelers*, 542 A.2d 72) (other citation omitted).  Moreover, "[t]o be binding, judicial admissions 'must be statements of fact that require evidentiary proof, not statements of legal theories.'" *Anderson v. Comm'r of Internal Revenue*, 698 F.3d 160, 167 (3d Cir. 2012) (quoting *In re Teleglobe Commc'ns Corp.*, 493 F.3d 345, 377 (3d Cir.2007)).

The judicial admission proffered by Axiall occurred during oral argument on Axiall's Motion to Compel Discovery (ECF No. 38).   Axiall first argues that in response to a subpoena to produce documents, information or objects, FC Tech, a non-party,

withheld or redacted numerous responsive documents on the grounds that they were privileged, including many of its direct email communications with descote and communications between counsel for FC Tech and descote.  *See* FC Tech Ans. to Mot. to Compel, ¶ 6 (ECF No. 41).  In its Answer to the Motion to Compel Discovery, FC Tech stated that it was a "part-owner of Descote S.A.S. with a real and important interest in this lawsuit far beyond that of a mere witness or non-interested third party," (FC Tech Ans., ¶ 2), and that it "shares the identical interest as Descote," (*Id.* at ¶ 16).  FC Tech further stated that it was not involved with the failure analysis of the valves "on its own", but "rather the failure analysis was done solely for the benefit of, as an agent of and as part-owner of Descote."  *Id.* at ¶3.  FC Tech further stated that as part owner of descote, it was a "client" of descote's counsel and entitled to discuss the litigation with descote's counsel, and those communications, as well as communications between its counsel and descote's counsel are protected by the attorney-client privilege.  *Id.* at ¶¶ 9, 11.[6]  However, Axiall filed a Reply in support of its motion to compel discovery (ECF No. 52) in which it provided evidence showing that FC Tech is not a part owner of descote S.A.S., but rather, is a part owner of descote Holdings, the parent company of descote S.A.S. (ECF No. 52-1).  Subsequently, counsel for FC Tech reached an agreement with Axiall's counsel to provide the documents which were the subject of the motion to compel discovery, and Axiall withdrew its motion.  *See* ECF No. 58.  In any event,

---

[6] To the extent that Axiall is attempting to argue that the statements of FC Tech's counsel are judicial admissions of an agency relationship between FC Tech/Mark Fucich and descote, that argument must fail as FC Tech/Mark Fucich are not parties to this litigation. *See Sherrill,* 624 A.2d at 243 ("A judicial admission is an express waiver made . . . *by a party or his attorney*" . . .).

allegations regarding non-party FC Tech's discovery conduct and statements, while evidence of the parties' business structure and relationship, cannot support a finding of a judicial admission against descote.

Axiall next contends that during oral argument on its motion to compel discovery, descote's counsel, Ms. Fedullo, made several statements on the record that constitute admissions that FC Tech and Mark Fucich were agents of descote. *See* Axiall's Mem. of Law in Supp. of Part. Mot. for Summ. J. at 12 ([ECF No. 269](#)). However, when Ms. Fedullo's statements are read in context with the entire transcript from oral argument, it is clear that she made no concessions of fact as to relevant agency. Rather, she was asserting an inconsistency between Axiall's position in its amended complaint that FC Tech was descote's agent and Axiall's argument in support of its motion to compel discovery that FC Tech was not a client of descote's counsel because it was a part-owner of descote's parent rather than descote. The Court notes that it was FC Tech's counsel who was opposing the subpoena and motion to compel, and arguing in support that FC Tech and Mr. Fucich were agents of descote in order to avoid production of communications on the basis of privilege; descote's counsel refrained from taking any further position on the issue. Again, FC Tech's discovery conduct cannot be a ground for finding that descote made a judicial admission that Mark Fucich and FC Tech are its agents.

### 2. Apparent Authority

Having found no judicial admission of agency, the Court turns to Axiall's second argument—that Mark Fucich and FC Tech acted with descote's apparent authority.

Although Axiall acknowledges that the issue of agency generally raises factual questions, it submits that where the facts relating to the issue of agency have been established of record, such that no genuine issue remains, the court can properly find agency as a matter of law, citing *K.A. Steel Trading v. Penn Terminals,* No. 96-4687, 1998 U.S. Dist. LEXIS 16379, at *7 (E.D.Pa. Oct. 13, 1998) (citing *Const. Bank v. DiMarco,* 836 F. Supp. 304, 307 (E.D.Pa. 1993)), and other state and federal court decisions applying Pennsylvania law.

In opposition, descote argues that Axiall has failed to provide the necessary evidence to support its theory that FC Tech had apparent authority to serve as descote's agent. descote also argues that the undisputed facts do not show an actual agency relationship between FC Tech and descote.

Under Pennsylvania law, the liability of a principal to third parties for the acts of its agent can be established based on either: "(1) express authority, or that which is directly granted; (2) implied authority, to do all that is proper, usual and necessary to the exercise of the authority actually granted; (3) *apparent authority, as where the principal holds one out as agent by words or conduct*, and (4) agency by estoppel." *Apex Fin. Corp. v. Decker,* 369 A.2d 483, 485 (Pa. Super. Ct. 1976) (citation omitted) (emphasis added); *see also Bolus v. United Penn Bank,* 525 A.2d 1215, 1221 (Pa. Super. Ct.1987) (citation omitted); *Penn City Investments, Inc. v. Soltech, Inc.,* No. 01-5542, 2003 WL 22844210, * 14 (E.D.Pa. Nov. 25, 2003) (citation omitted). [7] The party asserting an agency relationship

---

[7] Express and implied authority are included in the more general term, actual authority. *Jones v. Van Norman,* 522 A.2d 503, 511 (Pa. 1987). Express authority, which is found

bears the burden of proof on that issue. *Apex Fin. Corp.*, 369 A.2d at 485 (citing *Girard Trust Bank v. Sweeney*, 231 A.2d 407 (Pa. 1967)).[8]

"Apparent authority exists where a principal, by words or conduct, leads people with whom the alleged agent deals to believe that the principal has granted the agent authority he or she purports to exercise." *Turner Hydraulics, Inc. v. Susquehanna Constr. Corp.*, 606 A.2d 532, 534 (Pa. Super. Ct. 1992) (citation omitted; emphasis in original). In determining the apparent authority of an agent, the court must focus on the actions of the principal, not the agent. *Bolus*, 525 A.2d at 1222 (citations omitted); *Penn City Investments*, 2003 WL 228442210, at * 14 (citation omitted).

The Pennsylvania Supreme Court has provided the following explanation of apparent authority:

---

where the principal directly states that an agent has authority to perform a specific act on its behalf, is to be strictly construed. *Jones*, 522 A.2d at 511 (citations omitted). Based on the grant of express authority, an agent also acquires implied authority "to do all that is proper, necessary and ordinary to exercise the authority that has expressly been granted to him." *Id.* (citation omitted). Although implied, such authority is considered actual authority based on the presumption that the principal reasonably would want the act done in order to achieve the express purpose of the agency. *Id.* Implied authority, therefore, does not exist if there is no express authority in the first instance. *Ortiz v. Duff-Norton Co.*, 975 F.Supp. 713, 718 n.2 (E.D.Pa. 1997). Unlike implied authority, apparent authority can exist without express authority.

[8] The party with the burden of establishing an agency relationship need not provide direct proof of specific authority, as long as "'it can be inferred from the facts that at least an implied intention to create the relationship of principal and agent existed.'" *Walton*, 66 A.3d at 787 (quoting *Commw. v. Maker*, 716 A.2d 619, 623 (Pa. Super. Ct. 1998), *aff'd per curiam* 761 A.2d 1167 (Pa. 2000)). Agency cannot be assumed, however, merely by showing that one person has done an act for another. *Id.* (citing *Ferry v. Fisher*, 709 A.2d 399, 405 n. 5 (Pa. Super. Ct. 1998)).

> Apparent authority is power to bind a principal which the principal has not actually granted but which he leads persons with whom his agent deals to believe that he has granted. Persons with whom the agent deals can reasonably believe that the agent has power to bind his principal if, for instance, the principal knowingly permits the agent to exercise such power or if the principal holds the agent out as possessing such power.

*Azur v. Chase Bank, USA N.A.*, 601 F.3d 212, 219 (3d Cir. 2010) (quoting *Revere Press, Inc. v. Blumberg*, 246 A.2d 407, 410 (Pa. 1968) (citing RESTATEMENT (SECOND) OF AGENCY §§ 8, 27 (1958) (other citation omitted))).   Usually, apparent authority is shown by:

> some communication from the principal to the third party, such that it would be reasonable for the third party to infer that the principal consents to have the agent act for him. This can be shown, though, by the grant of limited authority to the agent, and conduct of the agent which demonstrates to the third party the agent's apparent authority to bind the principal.

*Ortiz*, 975 F.Supp. at 718 n. 3 (citing *Leidigh v. Reading Plaza Gen., Inc.*, 636 A.2d 666, 667-68 (Pa. Super. Ct. 1994); *Turner Hydraulics*, 606 A.2d at 534)).  If the third party has actual knowledge of the limits of the agent's authority, the third party cannot rely on the agent's apparent authority to bind the principal.  *Bolus*, 525 A.2d at 1222; *see also Universal Computer Sys., Inc. v. Med. Serv. Ass'n of Pa.*, 628 F.2d 820, 823 (3d Cir. 1980) (citing *Schenker v. Indem. Ins. Co.*, 16 A.2d 304, 306 (Pa. 1940)).  Without that actual knowledge, however, the third party is required to exercise only reasonable diligence to ascertain the agent's authority.  *Bolus*, 525 A.2d at 1222 (citation omitted).  As explained by the Pennsylvania Superior Court:

> The third party is entitled to believe the agent has the authority he purports to exercise only where a person of

> ordinary prudence, diligence and discretion would so
> believe. Thus, a third party can rely on the apparent
> authority of an agent when this is a reasonable interpretation
> of the manifestations of the principal.

*Id.* (internal citations omitted). *See also Azur,* 601 F.3d at 219 ("[t]he test for determining

whether an agent possesses apparent authority is whether a man of ordinary prudence,

diligence and discretion would have a right to believe and would actually believe that

the agent possessed the authority he purported to exercise.") (quoting *In re Mushroom

Transp. Co., Inc.,* 382 F.3d 325, 345 (3d Cir.2004) (quotations and citations omitted))

(footnote omitted).

Most often, the nature and extent of an agent's authority presents a question of

fact for the jury. *Bolus,* 525 A.2d at 1221 (citations omitted); *Turner Hydraulics,* 606 A.2d

at 534-35 (citing *Bolus, supra;* other citations omitted). Where, however, the facts relating

to the nature and existence of the agency relationship are sufficiently established, the

court may properly decide the issue. *Penn City Inv.,* 2003 WL 22844210, at * 14 (citation

omitted). *See, e.g., Am. Eagle Outfitters, Inc. v. Lyle & Scott Ltd.,* 644 F.Supp.2d 624, 644–

45 (W.D. Pa. 2008), *aff'd in part, rev'd in part and remanded sub nom. Am. Eagle Outfitters v.

Lyle & Scott Ltd.,* 584 F.3d 575 (3d Cir. 2009). The existence of apparent authority is

evaluated in light of all the circumstances of the parties' conduct. *Turner Hydraulics,*

606 A.2d at 535 (citations omitted). Moreover, apparent authority may be gleaned from

a course of dealing or a single transaction. *Id.* (citations omitted). Although "[a]pparent

authority is created by and flows from the acts of the principal, not from the personal

beliefs of the third-party[,] . . . [t]he manifestation of such authority to the third person

may be made directly to the third person, to the community, by advertising, by authorizing the agent to state that he is authorized or by continuously employing the agent." *Fields v. Horizon House, Inc.*, Civ. A. No. 86-4343, 1987 U.S. Dist. LEXIS 11315, at *13-14 (E.D.Pa. Dec. 8, 1987) (citations omitted).

Of particular usefulness in assessing the facts sub judice is this Court's previous summation of the law of apparent authority:

> "Apparent authority can exist only to the extent that it is reasonable for the third party dealing with the agent to believe the agent is authorized." *Jones v. ABN AMRO Mortg. Group, Inc.,* 551 F.Supp.2d 400, 410 (E.D.Pa.2008) (*quoting D & G Equip. Co., Inc. v. First Nat'l Bank of Greencastle,* 764 F.2d 950, 954 (3d Cir.1985)). 'The test for determining whether an agent possesses apparent authority is whether 'a man of ordinary prudence, diligence and discretion would have a right to believe and would actually believe that the agent possessed the authority he purported to exercise.' ' *Universal Computer Sys., Inc. v. Med. Svcs. Ass'n of Pa.,* 628 F.2d 820, 823 (3d Cir.1980) (citation omitted). Comment b to Section 3.03 of the Restatement (Third) of Agency (2006) explains that a principal may manifest an agent's authority to a third party:

> > by placing an agent in a defined position in an organization or by placing an agent in charge of a transaction or situation. Third parties who interact with the principal through the agent will naturally and reasonably assume that the agent has authority to do acts consistent with the agent's position or role unless they have notice of facts suggesting that this may not be so. A principal may make an additional manifestation by permitting the agent to serve as the third party's exclusive channel of communication to the principal.

*Am. Eagle Outfitters*, 644 F.Supp.2d at 644–45 (finding apparent authority of "sole representative" as a matter of law in suit by American retailer against European manufacturer).

Axiall proffers the following "undisputed facts"[9] as evidence that Mark Fucich and FC Tech acted with descote's apparent authority:

> Mark Fucich, in his Rule 30(b)(6) deposition as the designee of FC Tech, testified that he "represented FC Tech, who is the agent for descote in the U.S." (2/24/16 Fucich Dep. at 324:15-19, Axiall App. Ex. F, ECF No. 270-1 at 58.)

> descote's website identifies Mr. Fucich as the "Area Manager" for descote in the U.S. and Canada. (Axiall App. Ex. I, ECF No. 270-1 at 98.)

> descote's website also specifically lists FC Tech and Mark Fucich as the contacts for descote in the U.S. and Canada, and provides their U.S. phone number and website. (Axiall App. Ex. I, ECF No. 270-1 at 96-97.)

> Over the course of the parties' relationship, Mr. Fucich personally visited Axiall's Lake Charles Plant 20 to 30 times, sometimes accompanied by descote's president, Jean-Pierre Richer. (11/11/15 Fucich Dep. at 26:24-25 to 27:1-7, 32:19-23, 33:8-11, Axiall App. D, ECF No. 270-1 at 29-32.)

> Mr. Richer testified that Mark Fucich observed the testing of the pneumatically-operated descote valves at the Lake Charles Plant as descote's representative. (12/10/15 Richer Dep. at 28:22-25 to 29:2-6, Axiall App. Ex. M, ECF No. 270-1 at 133-34.)

> Mr. Fucich was also present in his capacity as descote's representative for some of the testing that took place by Stress Engineering in connection with the failed valves at issue in this case. (11/11/15 Fucich Dep. at 257:15-25 to 258:2-5, Axiall App. Ex. D, ECF No. 270-1 at 44-45.)

> Mr. Fucich represented descote in numerous chlorine industry functions:

---

[9] Initially, descote appears to accept, for argument sake, that Axiall's statement of facts in support of its agency argument are not disputed. Yet it later disputes several factual statements. As discussed herein, evaluation of apparent authority is made from the entirety of the record.

At meetings of The Chlorine Institute from the 1990s through the commencement of this action, Mr. Fucich regularly identified himself as a representative of descote.  (Minutes of Chlorine Inst., Axiall Ex. G, ECF No. 270-1 at 60-61, 66-67, 69, 73, 75, 77, 81, 83, 85, 87-88, 90.)

The president of The Chlorine Institute testified that Mark Fucich is descote S.A.S's U.S. agent.  (Reiner Dep. at 30:13-21, Axiall App. Ex. H, ECF No. 270-1 at 94.)

Axiall's employees attended Chlorine Institute meetings where Mr. Fucich represented descote.  (Axiall App., Ex. G, ECF No. 270-1 at 59-91.)

Mr. Fucich and FC Tech are also descote's representatives to the American Association of Railroads ("AAR").[10]  (2/24/16 Fucich Dep. at 302:10-13, Axiall App. Ex. F, ECF No. 270-1 at 57.)

In 2007, Mr. Fucich solicited Axiall's predecessor-in-interest, PPG, for the purpose of marketing descote's MOVs.  (Emails between Fucich & Julie Bart of PPG, Axiall App. Ex. N, ECF No. 270-1 at 136-37; 11/11/15 Fucich Dep. at 57:12-24, Axiall App. Ex. D, ECF No. 270-1 at 34.)

On October 29, 2007, Mr. Fucich represented to Julie Bart of PPG that "[t]his valve will carry a 100% descote warranty back (sic) by the factory."  (Axiall App. Ex. N, ECF No. 270-1 at 136) (email referring to descote bellows seal chlorine angle valve for tank car service).[11]

Based on representations made by Mark Fucich to PPG's representatives at PPG's offices in Allegheny County, Pennsylvania, PPG ultimately decided to purchase the MOVs manufactured by descote.  (Am. Compl., ¶27, ECF No. 9; Axiall App. Ex. Q, ECF No. 270-1 at 146-52.)

---

[10] The American Association of Railroads ("AAR") is a trade association whose members include the largest freight railroads in the United States.  The AAR establishes safety, security, and operating standards for the United States rail system.  (Stipulations, ¶ 19.)

[11] In addition, the record indicates that Fucich made the same representation orally to Julie Bart in conjunction with PPG's decision to purchase the descote MOVs.  (Bart Aff. dated 10/26/17 at ¶ 14, Axiall App. Ex. S, ECF No. 304-19 at 3; 11/11/15 Fucich Dep. at 56-57, Axiall App. Ex. A, ECF No. 304-1 at 15-16.)

After PPG purchased the descote MOVs, Mr. Fucich conducted training sessions for Axiall's employees on how to use them and for ARI personnel on how to install them. (11/11/15 Fucich Dep. at 80:17-25 to 82:2-12, 91:16-25 to 92:2-12, Axiall App. Ex. D, ECF No. 270-1 at 36-38, 39-40; Bart Dep. at 113:2-8, 183:11-22, Axiall App. Ex. B, ECF No. 270-1 at 17-18.)

Nicole Sims, a former PPG employee and current chlorine loading operations supervisor for Axiall, testified that "it was just well known that Mark Fucich was the point of contact for descote." (2/11/17 Sims Dep. at 89:5-10, Axiall App. Ex. O, ECF No. 270-1 at 140.)

Thomas Hester, one of Axiall's operations personnel, also testified that Mark Fucich "was one of our contacts for descote valves." (2/4/16 Hester Dep. at 63:21-25 to 64:2-9, Axiall App. Ex. P, ECF No. 270-1 at 143-44.)

At the instruction of descote's president, Mr. Richer, and as descote's agent, FC Tech/Mark Fucich hired Stress Engineering to conduct a valve failure analysis. (2/24/16 Fucich Dep. at 283:24-25 to 284:2-15, Axiall App. F, ECF No. 270-1 at 53-54; 11/11/15 Fucich Dep. at 256:3-16, Axiall App. Ex. D, ECF No. 270-1 at 43; Stress Eng'g Final Rpt., Axiall App. Ex. R, ECF No. 270-1 at 154-202.)

Mr. Richer directed Mark Fucich to instruct Stress Engineering to remove two key sentences from its draft report, which had the effect of concealing from Axiall the fact that the dual angle valve springs were not suitable for Axiall's flow rates at the Lake Charles Plant. (12/4/13 email from M. Fucich, Axiall App. Ex. U, ECF No. 270-1 at 262; 2/24/16 Fucich Dep. at 288:14-19, Axiall App. Ex. F, ECF No. 270-1 at 55.)

Axiall Mem. of Law in Supp. of Mot. for Partial Summ. J. at 15-16 (ECF No. 269).

Axiall thus submits that descote held Mr. Fucich and FC Tech out as its agents to Axiall, PPG, other members of the commodity chemicals industry, and the public. Therefore, Axiall contends, it was reasonable for it and PPG to believe that Mr. Fucich and FC Tech acted with descote's apparent authority with regard to all matters involving the valves at issue.

In response, descote initially argues that the undisputed facts fail to show an actual agency relationship between FC Tech and descote, even though Axiall has not asserted an agency relationship based on actual authority. descote goes on to argue that without any evidence of an underlying agent/principal relationship, this Court should be reluctant to find an agency relationship based on apparent authority or agency by estoppel. The Court rejects this argument outright as contrary to Pennsylvania law on agency. *See supra*.

Next, descote argues that the "undisputed facts" upon which Axiall relies to establish apparent authority do not provide the necessary evidence to support its theory that FC Tech had apparent authority to serve as descote's agent. With regard to Axiall's evidence focusing on Mr. Fucich's testimony that he identified himself as a representative of descote at chlorine industry events and meetings, descote argues that these statements do not support apparent authority because an agency relationship cannot be assumed from the mere fact that one does an act for another, or from the agent's own words. descote misapplies the Pennsylvania law it states. An agency relation cannot, without more, be assumed from the agent's own act or words. But Mr. Fucich's acts and statements are far from the *only* evidence of apparent authority being proffered. Axiall is not relying solely on Fucich's statements to establish apparent authority, to the contrary it has proffered extensive evidence from other sources, including most significantly, descote, to meet its burden. As the Court noted above, apparent authority may be gleaned from a course of dealing. *Turner Hydraulics, 606*

A.2d at 535.  Mr. Fucich's statements are evidence of PPG's/Axiall's course of dealing with descote and FC Tech/Fucich over a 10 plus year period.

Next, descote attempts to discount evidence from descote's current website and Mr. Fucich's testimony regarding his role as "descote's representative" during the Stress Engineering tests and valve installation training, on the basis that this evidence manifested subsequent to (1) FC Tech's/Fucich's representation that the descote valves came with a 100% factory backed warranty and (2) Axiall's reliance on that representation in 2012.   In support, descote cites *Jurimex Kommerz Transit G.M.B.H. v. Case Corp.*, No. 06-3523, 2007 U.S. App. LEXIS 18113, at *8 (3d Cir. July 9, 2007), for the proposition that "'[a]lleged subsequent agency authority, real or apparent' is irrelevant to alleged agency in earlier negotiations."  descote's Mem. of Law in Opp'n at 16 (ECF No. 309).   *Jurimex* is not precedential, and even if it were, it applied Delaware law on agency.  Most importantly, descote cannot now remove the cloak of apparent authority with which it draped FC Tech/Fucich by cherry-picking bits of what remains overwhelming undisputed evidence before the Court.

With regard to Axiall's evidence that (1) Fucich served "as descote's representative during the testing of the pneumatically-operated descote valves that was conducted at the Lake Charles Plant" in the early to mid-1990s, and (2) Fucich visited "Axiall's Lake Charles Plant 20 to 30 times, sometimes accompanied by descote's president, Jean-Pierre Richer," descote argues that this evidence is insufficient to show

that descote provided FC Tech with authority to act on its behalf.[12]  To the extent that some of Fucich's 20-30 visits to the Lake Charles Plant were on behalf of companies other than descote, those visits should not be considered as evidence of an agency relationship between FC Tech/Fucich and descote.  Nonetheless, the evidence shows that Fucich made several visits to the Lake Charles Plant for testing of the pneumatic valves, and for training of Axiall's employees on the use and installation of the descote 922 valves after they were purchased.  Moreover, Mr. Richer testified that over the two-year testing period on the valves at the Lake Charles Plant, descote's representative to observe the testing was Mark Fucich.  (Richer Dep. at 28-29, Axiall's App. Ex. H, ECF No. 304-8 at 5-6.)  The evidence of record is that Fucich negotiated the sale of the descote 922 valves with PPG/Axiall, sold the valves on behalf of descote, and provided training after that sale.

Finally, descote maintains that even if the "undisputed facts" could support a finding of apparent authority, Axiall fails to show how its belief that FC Tech was descote's agent is traceable to anything descote did, said, or manifested.   This argument lacks merit.  It is clear from the record evidence that by virtue of descote's purposeful business structures and relationships, the only way for a company in the United States or Canada to purchase valves from descote, a company with its principal place of

_____

[12] descote contends that the 3 to 4 visits Fucich made to the Lake Charles Plant with Mr. Richer are reflective of their respective roles distributor and manufacturer, and do not suggest a principal/agent relationship.  Again, the Court is assessing descote's creation of apparent authority created in its United States/Canadian exclusive representative over the course of many years' dealings (*i.e.*, in light of all of the evidence proffered by Axiall).

business in Feyzin, France, was to contact, and conduct its descote-related commercial transactions through, FC Tech/Mark Fucich, descote's exclusive distributor/sales representative in the United States and Canada.  (descote's website, Axiall App. Ex. I, ECF No. 270-1 at 96-100; Richer Aff. dated 9/28/17 at ¶7, descote's App., ECF No. 285 at 144; Email from Fucich to Bart dated 10/29/07,[13] descote's App., ECF No. 285 at 109; 11/11/15 Fucich Dep. at 236, Axiall App. Ex. D, ECF No. 270-1 at 41; Fucich Aff. dated 9/28/17 at ¶ 5, descote App., ECF No. 285 at 147; Fucich Aff. dated 10/27/17 at ¶ 5, ECF No. 308-1 at 14.)  descote's website clearly identifies FC Tech/Fucich as the contact person for U.S. and Canadian sales.  (Axiall App. Ex. I, ECF No. 270-1 at 96-100.)  All promotional literature and technical information on the descote valves was provided to Axiall by Mark Fucich.  (Bart Aff. dated 10/26/17 at ¶¶ 10-11, Axiall App. Ex. S, ECF No. 304-19 at 3.)  The negotiations for the purchase of the descote 922 valves were conducted by Mark Fucich with Julie Bart.  (*Id.* at ¶ 20, ECF No. 304-19 at 4; 11/11/15 Fucich Dep. at 57, Axiall App. Ex. D, ECF No. 270-1 at 34.)   Training as to the use and operation of the descote 922 valves was provided by FC Tech.  (11/11/15 Fucich Dep. at 80:17-25 to 82:2-12, 91:16-25 to 92:2-12, Axiall App. Ex. D, ECF No. 270-1 at 36-38, 39-40; Bart Dep. at 113:2-8, 183:11-22, Axiall App. Ex. B, ECF No. 270-1 at 17-18.)  Questions or problems with descote valves were directed to and addressed by FC Tech and descote.  *See, e.g.,* footnote 15, *infra.*

---

[13] Fucich's 10/29/07 email to Julie Bart references an attached letter from Tyco, announcing FC Tech as the exclusive factory authorized distributor for descotes valves in the USA and Canada.  (descote's App., ECF No. 285 at 109.)

The extensive undisputed evidence of apparent authority from descote to FC Tech/Mark Fucich is not surprising given their common ownership interests,[14] and broad presentation of joint acts (as with the investigation into the valve failures,[15] or participation/joint membership in the Chlorine Institute and AAR). (11/11/15 Fucich Dep. at 67, Axiall App. Ex. D, ECF No. 270-1 at 35; 2/24/16 Fucich Dep. at 302, Axiall App. Ex. F., ECF No. 270-1 at 57; Fucich Aff. dated 10/27/17 at ¶ 8, ECF No. 308-1 at 15.)  Members of these professional organizations shared Axiall's belief that FC

---

[14] FC Tech first developed an ownership interest in descote in 2006, which still existed in November of 2015.  (11/11/15 Fucich Dep. at 17& 19, Axiall App. Ex. A, ECF No. 304-1 at 5 & 7.)

[15] For example, on 11/18/13, Mr. Richer issued a Report (Rev. 3) on the descote valves failure on chlorine Axiall tank cars, which listed Mark Fucich and JPR (i.e., Jean-Pierre Richer) as participants.   (descote Report, Axiall App. Ex. U, ECF No. 304-21 at 4-6.) Mark Fucich distributed this report to Tom Logston at Axiall on 11/21/13.  (Fucich Email dated 11/21/13, Axiall App. Ex. U, ECF No. 304-21 at 2-3.) The descote Report indicates that Axiall informed descote in August 2013 of the first valve failure, and in response, FC Tech was present on 10/29/13 on site and participated in the removal of the 922 and 926 parts and replaced all of the damaged parts. (descote Report, ECF No. 304-21 at 4.)  In addition, the descote Report states that on 11/5/13, Fucich and Richer participated in a complete investigation of the four damaged valves.  (Id., ECF No. 304-21 at 4-5.)  In October of 2013, Axiall reported a second valve failure to descote.  (Id., ECF No. 304-21 at 5.)  On 11/13/13, Fucich participated in a full examination of the four valve sets (926/922) at Watco along with representatives from ARI, SALCO, and Axiall. (descote Report, ECF No. 304-21 at 5; Stress Eng'g Rept. Dated 12/4/13, Axiall App. Ex. R, ECF No. 270-1 at 157.)    Finally, at the instruction of descote's president, Mr. Richer, FC Tech/Mark Fucich, as descote's agent, hired Stress Engineering to conduct a valve failure analysis, and the information was sent directly to the factory,  (2/24/16 Fucich Dep. at 283:24-25 to 284:2-15, Axiall App. F, ECF No. 270-1 at 53-54; 11/11/15 Fucich Dep. at 256:3-16, Axiall App. Ex. D, ECF No. 270-1 at  43; Stress Eng'g Final Rpt., Axiall App. Ex. R, ECF No. 270-1 at 154-202), and directed Stress Engineering to delete the last two sentences on page 10 of its draft report (2/24/16 Fucich Dep. at 288, Axiall App. Ex. F, ECF No. 270-1 at 55; Fucich email to M. Bartel dated 12/4/13, Axiall App. Ex. JJ, ECF No. 304-36 at 2).

Tech/Fucich were descote's designated agent in the United States.  (Reiner Dep. at 30:13-21, Axiall App. Ex. H, ECF No. 270-1 at 94; Minutes of Chlorine Inst., Axiall Ex. G, ECF No. 270-1 at 60-61, 66-67, 69, 73, 75, 77, 81, 83, 85, 87-88, 90; 2/24/16 Fucich Dep. at 302:10-13, Axiall App. Ex. F, ECF No. 270-1 at 57.)

Thus, the totality of this evidence leaves no reasonable conclusion other than that descote – by its business relationships and designations, and long and broad course of conduct - held FC Tech/Fucich out as its agent, created apparent authority by its words and deeds, and led Axiall and others to believe that FC Tech/Fucich was acting with descote's consent.  More particularly, descote created the appearance that FC Tech/Fucich possessed apparent authority to act as descote's agent in all matters involving the sales of the descote 922 valves to PPG/Axiall, and the subsequent investigation into the valve failures.  Accordingly, the Court will grant Axiall's motion for partial summary judgment on the issue of FC Tech's apparent authority; it concludes that "no reasonable jury could find otherwise".  *Am. Eagle Outfitters,* 644 F.Supp.2d at 646 (concluding as a matter of law, and on entirety of the relevant evidence, that individual appointed by manufacturer as "the conduit" for interactions between the litigants "possessed at least apparent authority"); *id.* (noting that principal placed individual in a position which clearly justified an assumption of agency and principal pointed to nothing in record that would have put plaintiff on notice that authority was lacking).[16]

---

[16] Because the Court finds that FC Tech/Fucich possessed apparent authority to act as descote's agent, it need not reach Axiall's alternative argument of agency by estoppel.

## B.	DESCOTE'S MOTION FOR SUMMARY JUDGMENT AGAINST AXIALL

In its motion for summary judgment, descote asks this Court to enter judgment in its favor on all of Axiall's claims against it—breach of express warranty (count I), breach of implied warranty of merchantability (count II), breach of implied warranty of fitness for a particular purpose (count III), and misrepresentation (count IV).  The Court turns first to descote's argument supporting dismissal of Axiall's breach of warranty claims.

### 1.	Axiall's Breach of Warranty Claims Against descote

Resolution of descote's request for summary judgment in its favor on Axiall's warranty claims requires the Court to engage in a choice-of-law analysis.  The parties dispute which state's laws should be applied—Axiall argues that Pennsylvania law, which does not require privity of contract for breach of warranty claims involving only economic loss,[17] should be applied, while descote submits that Illinois law which, under the circumstances here, requires privity of contract when only economic loss exists, should be applied.

The parties agree, however, that in a diversity case such as this, the choice-of-law rules of the forum state—Pennsylvania—must be applied by this Court.  *Pacific Employers Ins. Co. v. Global Reinsurance Corp. of Am.*, 693 F.3d 417, 432 (3d Cir. 2012)

---

It notes, however, that the explication provided above indicates that descote caused Axiall to believe an agency relationship existed and descote neglected to disavow that belief.

[17] *See Kassab v. Central Soya*, 246 A.2d 848, 856 (Pa. 1968)*, overruled on other grounds by AM/PM Franchise Ass'n v. Atlantic Richfield Co.*, 584 A. 2d 915, 925-26 (Pa. 1990).

(citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)); *Hammersmith v. TIG Ins. Co.,* 480 F.3d 220, 226 (3d Cir. 2007).  "Pennsylvania applies the more flexible, 'interests/contacts' methodology to contract choice-of-law questions."  *Hammersmith,* 480 F.3d at 226-27 (footnote omitted).  Under this approach, courts must analyze the policies and interests underlying the particular issue before it, and "apply the law of the forum with the 'most interest in the problem,' rather than the law of the place of injury."  *Id.* at 227 (quoting *Griffith v. United Air Lines, Inc.*, 203 A.2d 796, 805-06 (Pa. 1964)).

The first step in a choice-of-law analysis involves the identification of the jurisdictions whose laws might apply.  *Hammersmith*, 480 F.3d at 230.  In this case, the parties have identified Illinois and Pennsylvania.  Next, the court must examine the substance of the identified states' laws, and look for actual, relevant differences between them.  *Pacific Employers*, 693 F.3d at 432 (citing *Hammersmith*, 480 F.3d at 230).  In conducting this examination:

> If [the] two jurisdictions' laws are the same, then there is no *conflict* at all, and a choice of law analysis is unnecessary."[*Hammersmith*, 480 F.3d at 230]. (emphasis in original). If there are actual, relevant differences between the laws, then we "examine the governmental policies underlying each law, and classify the conflict as a 'true,' 'false,' or an 'unprovided-for' situation." *Id.* "A deeper [choice of law] analysis is necessary only if *both* jurisdictions' interests would be impaired by the application of the other's laws (*i.e.*, there is a true conflict)." *Id.*

*Id.* at 432 (internal quotation marks, footnote, and citations omitted) (emphasis in original).[18]  The court of appeals further explained:

> If a true conflict exists, the Court must then determine which state has the "greater interest in the application of its law." *Cipolla,* 267 A.2d at 856.  In *Melville,* we described the *Griffith* methodology as a combination of the "approaches of both [the] Restatement II (contacts establishing significant relationships) and 'interests analysis' (qualitative appraisal of the relevant States' policies with respect to the controversy)." 584 F.2d at 1311. This analysis requires more than a "mere counting of contacts." *Cipolla,* 267 A.2d at 856. "Rather, we must weigh the contacts on a qualitative scale according to their relation to the policies and interests underlying the [particular] issue." *Shields v. Consol. Rail Corp.,* 810 F.2d 397, 400 (3d Cir.1987).

*Hammersmith,* 480 F.3d at 231 (footnote omitted) (emphasis in original).

As the moving party, descote argues that because Illinois has a strict privity requirement for warranty claims based purely on economic loss while Pennsylvania does not, and there is no applicable exception under Illinois law to its strict privity requirement in purely economic loss cases, a true conflict exists between Illinois and Pennsylvania warranty law with respect to whether buyers not in privity can bring claims against remote manufacturers for purely economic loss.   descote then proceeds directly to a discussion of which jurisdiction has the most significant relationship to the dispute.[19]  In so doing, descote analyzes the five factors cited in the Restatement

---

[18] An "unprovided for" situation arises when "*neither* state's interests would be impaired if its laws were not applied.  *Hammersmith,* 480 F.3d at 230 n. 9 (citing *Garcia,* 421 F.3d at 220).  If the court determines that the situation is "unprovided for," then the traditional, *lex locus contractus* rule (i.e., the law of the place of contract) is applied.  *Id.*

[19] This is actually the third step in the choice-of-law analysis.  descote skipped the second step, which requires an examination of the governmental policy interests

(Second) of Conflicts of Law, § 188(2) (1971), and concludes that Illinois was the focal point of the relevant sales of the descote valves, and therefore has the most significant relationship to Axiall's warranty claims.

In opposition, Axiall submits a two-fold argument. First, Axiall argues that an actual conflict does not exist between Illinois and Pennsylvania law because Illinois provides several applicable exceptions to the privity rule, and therefore, even under Illinois law, it would not be required to prove privity of contract to maintain its breach of warranty claims. Second, Axiall maintains that even if the Court were to find an actual conflict exists between Illinois and Pennsylvania law, it would be a false conflict because Illinois' interest in enforcing its privity requirement is not implicated here where descote is neither a remote manufacturer nor lacked the ability to foresee a claim in Pennsylvania regarding the sale of its valves. Moreover, Axiall submits that no party to this lawsuit is a resident of Illinois. Therefore, any conflict that exists is a false conflict.[20]

At first blush, the laws of Illinois and Pennsylvania regarding warranty claims appear to be in conflict—one requires privity of contract while the other does not.

---

underlying each law to determine if both jurisdictions' interests would be impaired by the application of the other's laws, *see Pacific Employers*, 693 F.3d at 432 (citing *Hammersmith*, 480 F.3d at 230), thus indicating the existence of a true conflict. The third step is only reached if the court determines that the interests of both jurisdictions would be impaired by the other's laws. *Id.*

[20] Axiall also maintains that if there were an actual, true conflict, application of the five restatement factors would result in the Court finding that Pennsylvania has the more significant relationship with the descote valves, thus triggering application of its law to the warranty claims. The Court need not reach this argument, however, because of its determination that an actual, true conflict does not exist here.

However, when the Court looks below the surface, it finds that—in light of applicable Illinois privity rule exceptions—the laws do not actually conflict.

### a. Express Warranty Claim

With regard to its express warranty claim, Axiall argues that Illinois does not require privity "if a manufacturer expressly warranted its goods to the ultimate consumers and this was the basis for the bargain and relied upon by the plaintiffs," quoting *Rosenstern v. Allergan, Inc.,* 987 F. Supp. 2d 795, 805 (N.D. Ill. 2013). Axiall submits that this exception tracks Section 2-313 of the Illinois Uniform Commercial Code, which states: "Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise." 810 ILL. COMP. STAT. 5/2-313(1)(a) (West 1994). *See also* 13 Pa. Cons. Stat. § 2313(a)(1) (West 1994).

In response, descote contends that Axiall's reliance on *Rosenstern* is misplaced, as that case involved personal injury, and thus, was not purely an economic loss case. While descote is correct that the plaintiff in *Rosenstein* alleged personal injuries with regard to a products liability claim in addition to economic losses from breach of warranty claims, a close examination of the court's analysis in *Rosenstein* reveals that its ruling on the express warranty claim was not predicated upon the existence of personal injuries.[21] Rather, the court looked at the communications made directly with the buyer

---

[21] The existence of personal injuries was a dispositive factor in the court's ruling with regard to the plaintiff's claim for breach of an *implied* warranty. 987 F. Supp. 2d at 804.

prior to the purchase and whether this was the basis of the bargain and relied upon by the buyer.  987 F. Supp. 2d at 805.  The court went on to hold that "because the assertions became part of the basis of the bargain unless clear affirmative proof shows otherwise[,]"the ultimate consumer may proceed against the manufacturer on an express warranty claim despite an absence of privity.  Id. (citation and internal quotation marks omitted).

Here the record shows that descote's agent, Mark Fucich, in a 2007 email, told Julie Bart at PPG that the descote bellows seal chlorine angle valve, which PPG was considering to buy, came with a 100% factory warranty.  (Fucich Email dated 10/29/17, Axiall App. Ex. G, ECF No. 304-7 at 2.)  Later in 2011, when Julie Bart was negotiating the purchase of the descote MOVs with Fucich, Bart stated that Fucich represented to her that any purchase of descote's MOVs would have a descote factory warranty.  (Bart Aff. dated 10/26/17, ¶ 14, Axiall App. Ex. S, ECF No. 304-19 at 3.)  Fucich testified that he believed that when a valve manufactured by descote is purchased by any end user in the United States for transportation or process, the 100% descote warranty applies. (11/11/15 Fucich Dep. at 56-57, Axiall App. Ex. A, ECF No. 304-1 at 15-16.)  Moreover, Axiall contends that Fucich was acting as descote's agent when he made the representations that the descote valve came with a 100% factory backed warranty.

As the Court held above, the undisputed evidence shows that FC Tech/Fucich was acting as the apparent agent of descote in marketing and selling the descote valves to PPG/Axiall.   Thus, at trial, a reasonable jury could conclude that the requirements of Illinois UCC--§ 2-313((1)(a) have been met, in which case privity of contract would not

be required between descote and Axiall, thereby affording Axiall a basis under Illinois law to proceed on its express warranty claim against descote.

descote attempts to avoid application of § 2-313 by arguing that in the absence of privity, there must be an assignment of the express warranty from a party in privity with descote. This argument misses the mark because if the jury believes Axiall's evidence, the exception to the privity requirement in § 2-313(1)(a) applies, as the express warranty was made directly to the buyer who relied on it. Under these circumstances, no assignment of the warranty is required. Nor is the Court convinced otherwise by descote's reliance on *Collins Co., Ltd. v. Carboline Co.*, 864 F.2d 560, 561 (7th Cir. 1989) ("*Collins II*"), and *Caterpillar, Inc. v. Usinor Industeel*, 393 F. Supp. 2d 659, 677 (N.D. Ill. 2005), for the position that the strict privity requirement in purely economic loss cases is also extended to express warranty claims in the absence of an assignment of express warranty rights from a party in privity.[22]

In *Collins*, the question before the court of appeals was whether plaintiff, who was not in privity with the defendant manufacturer, could maintain a claim against the manufacturer for both economic losses and consequential damages on a breach of express warranty claim, where the original owners of the warehouse assigned their express warranty from the manufacturer against roof leakage to plaintiff, the

---

[22] descote also cites to *Spiegel v. Sharp Electronics Corp.*, 466 N.E. 2d 1040, 1043 (Ill. App. 1984), for the general proposition that Illinois law has a different body of warranty law for purely economic losses. However, *Spiegel* is factually distinguishable from the case at bar, as there were no facts alleged in that case to suggest that manufacturer expressly warranted its goods to the ultimate consumer and this was the basis for the bargain and relied upon by the plaintiff. Therefore, the appellate court did not consider the argument that Axiall has raised here.

subsequent purchaser of the warehouse. *Collins Co., Ltd. v. Carboline Co.,* 837 F.2d 299, 301 (7th Cir. 1988) ("*Collins I*"). The court of appeals declined to answer this question and instead certified it to the Illinois Supreme Court. *Id.* at 302. Upon consideration of this issue, the Illinois Supreme Court held that "the assignee of a warrantee's rights under an express warranty, if the assignment is otherwise valid, succeeds to all those rights and thus stands in privity with the warrantor." 532 N.E. 2d 834, 837 (Ill. 1988). Interestingly, the Illinois Supreme Court declined to address the district court's conclusion that privity is required of a plaintiff who seeks recovery under an express warranty. *Id.* Subsequently, having received the Illinois Supreme Court's decision on the certified question, the court of appeals concluded that the manufacturer's warranty extended to plaintiff and reversed the district court's judgment granting the manufacturer's motion for judgment on the pleadings. *Collins II,* 864 F.2d at 561.

It is clear that *Collins* is factually distinguishable from the case at bar. In that case, the plaintiff sought to establish privity through a valid assignment of an express warranty. Here, Axiall is seeking to enforce an express warranty allegedly made directly from descote's agent, Mark Fucich, to PPG's employee, Julie Bart, upon which she relied and which formed the basis of the bargain. No such allegations were present in *Collins*. Moreover, Axiall is *not* arguing that Fucich made a valid assignment of the descote warranty to Axiall. And, contrary to descote's contention, the Illinois Supreme Court, on certification, did not explicitly clarify that in the absence of a valid assignment, strict privity is required to recover for economic losses on an express warranty claim. That question was not addressed by the Illinois Supreme Court in

either *Collins, see* 532 N.E. 2d at 842, or *Szajna v. General Motors Corp.*, 503 N.E. 2d 760, 767 (Ill. 1986)[23] (declining to abolish the privity requirement in actions to recover only economic losses for breach of implied warranty claims).[24]

In addition, under Illinois law, "oral statements made in the course of a business relationship may rise to the level of express guarantees." *Abco Metals Corp. v. J.W. Imports Co, Inc.*, 560 F. Supp. 125, 129 (1982)(citing *Capital Equip. Enters., Inc. v. North Pier Terminal Co.*, 254 N.E. 2d 542 (Ill. App. 1st Dist. 1969)). The Court finds that undisputed evidence exists from which a reasonable jury could find that the oral and written statements made by Fucich regarding the descote values during the course of his business relationship with PPG/Axiall, and under apparent authority as descote's agent, rise to the level of express guarantees, sufficient to meet the privity requirement. Thus, under this theory or Illinois UCC § 2-313, Axiall's express warranty claim would not be precluded by Illinois law.

_____

[23] *See Ampat/Midwest, Inc. v. Illinois Tool Works, Inc.*, No. 85 C 10029, 1988 WL 53222, at *3 n. 2 (N.D. Ill. May 12, 1988). Indeed, the plaintiff in *Szajna*, like Axiall here, relied on UCC § 2-313(a)(1) to establish an express warranty claim. 503 N.E. 2d at 770-71. The supreme court upheld the trial court's dismissal of the express warranty claim, holding that an automobile's trade name alone did not create an express warranty of the kind or nature of the car's components. *Id.* at 771. In so holding, the *Szajna* court implicitly, if not explicitly, acknowledged that an express warranty claim could be maintained under UCC 2-313(a)(1) without privity. *Ampat/Midwest*, 1988 WL 53222, at *3 n. 2 (citing *Szajna v. Gen. Motors Corp.*, 474 N.E. 2d 397 (Ill. App. 1985), *rev'd on other grounds* 503 N.E. 2d 760 (Ill. 1986)).

[24] Similarly, descote's reliance on *Caterpillar* is misplaced. In holding that only a valid assignment of the express warranty created privity of contract, the *Caterpillar* court cited to the court of appeals' decisions in *Collins I* and *Collins II*, but, as explained above, neither of those decisions supports the *Caterpillar* court's overly broad statement of Illinois law regarding privity and express warranties.

Therefore, Axiall appears to have a viable express warranty claim against descote under both Illinois and Pennsylvania law.   And therefore, no actual conflict exists between the two states' laws as to Axiall's express warranty claim.  As such, no further choice-of-law analysis is mandated with regard to Axiall's express warranty claim against descote.

**b.    Implied Warranty Claims**

With regard to Axiall's implied warranty claims against it, descote initially argues that Illinois law has a strict privity requirement for implied warranty claims against remote manufacturers in purely economic loss cases, while Pennsylvania does not.  descote maintains that while Illinois has relaxed the privity requirement for cases involving personal injuries, it has not done so for cases involving purely economic losses, citing *Collins,* 837 F.2d at 301.  descote further argues that the preponderance of the evidence shows that there is no applicable exception under Illinois law to the privity requirement in purely economic loss cases.   descote contends that the cases cited by Axiall for the proposition that under some circumstances privity of contract is not required to enforce a manufacturer's warranty, are distinguishable, and thus, inapposite.   As the undisputed facts demonstrate that PPG was not in privity with descote, and based on *Szajna*, *Collins II*, and *Caterpillar,* descote maintains that Axiall's implied warranty claims are barred by Illinois law.  As such, descote argues that Illinois law actually conflicts with Pennsylvania law with regard to Axiall's implied warranty claims against descote.

In response, Axiall disagrees with descote's statement of Illinois law, and submits that the Illinois courts have recognized several exceptions to the privity requirement for implied warranty claims involving only economic loss which apply here. The Court turns first to the direct relationship exception.

The direct relationship exception "applies when there are direct dealings between the manufacturer and the remote customer." *Elward v. Electrolux Home Prods., Inc.*, 214 F. Supp. 3d 701, 705 (N.D. Ill. 2016)(citing *Frank's Maint. & Eng'g, Inc. v. C.A. Roberts Co.,* 408 N.E. 2d 403, 412 (Ill. App. 1980)); *see also Abco Metals,* 560 F. Supp. at 128 (applying direct relationship exception to relationship between remote manufacturer and buyer). This direct relationship can be established through direct dealings between the customer and the manufacturer's agent. *Elward,* 214 F. Supp. 3d at 705 (citing *Abco Metals Corp.,* 560 F. Supp. at 128; *In re Rust-Oleum Restore Marketing, Sales Practices & Prods. Liab. Litig.*, 155 F. Supp. 3d 772, 806-07 (N.D. Ill. 2016)).

Axiall argues that the overwhelming evidence of record demonstrates that descote had direct relationships with both PPG and Salco, either of which is sufficient to meet the direct relationship exception and overcome the privity requirement for implied warranty claims in Illinois.[25] In its reply brief, descote focuses only on the relationship between it and Salco, in rejecting Axiall's argument that *Frank's Maintenance* supports the application of the direct relationship exception. descote maintains that no Illinois court has actually held that there is an exception to the privity requirement based on the relationship between a manufacturer and the seller. Actually,

---

[25] Axiall does not provide any edification on this point in its responsive brief.

in *Frank's Maintenance*, the Illinois appellate court recognized just such an exception, but did not apply it, choosing instead to apply the third-party beneficiary exception discussed below. Instead of focusing on the relationship between Salco and descote, the Court turns its attention to the relationship between descote and Axiall /PPG.

In determining whether a direct relationship exists between Axiall and descote, the Court finds several cases instructive on this issue. In *Elward*, the plaintiff and other remote customers purchased dishwashers through retailers who were the manufacturer's agents. 214 F. Supp. 2d at 703. Plaintiff alleged that she and the other remote customers had a direct relationship with the dishwasher manufacturer's agents. *Id.* at 705. She also alleged direct dealings with the manufacturer through its advertisements, warranty forms, and registration cards. Based on these direct dealings, plaintiff alleged that she and the other remote customers expected their dishwashers to last considerably longer than they actually did. The court found that these allegations stated a plausible claim for breach of implied warranty against the manufacturer under the direct relationship exception to the privity requirement. *Id.*

Similarly, in *Abco Metals*, the district court found that plaintiff had alleged a plausible breach of implied warranty claim based upon the direct dealings exception. In that case, the plaintiff, which operated a scrap metal processing business, brought, among other things, breach of warranty claims against a Denmark corporation which manufactured an allegedly defective wire chopper that plaintiff purchased for use in its business. Plaintiff purchased the wire chopper from the manufacturer's exclusive distributor for North America. Plaintiff had prior business dealings with the distributor

and had previously purchased a smaller capacity wire chopper manufactured by the same Denmark corporation through the distributor. 560 F. Supp. at 126-27. Prior to the sale at issue, plaintiff's president, the distributor's president, and an engineer employed by the Denmark corporation met to discuss plaintiff's particular requirements and the details of the proposed sale. Id. at 127. The distributor's president and the manufacturer's engineer agreed that the manufacturer would sell to plaintiff the wire chopper and they guaranteed that the wire chopper would meet the requirements outlined by plaintiff's president. Id. Significantly, the Denmark corporation sold the wire chopper to the distributor, who in turn sold the wire chopper to an equipment leasing company, who leased it to plaintiff with an option to purchase the chopper at the end of the lease. Id. Plaintiff alleged that it had informed the distributor and manufacturer that the arrangement with the lessor was strictly for financing purposes, and despite the "lease" characterization, the nature of the entire arrangement was that plaintiff was purchasing the wire chopper from the distributor and the manufacturer. Id.

When the wire chopper failed to work as expected, plaintiff brought breach of express and implied warranty claims against the manufacturer. The manufacturer challenged the warranty claims arguing that privity of contract did not exist between it and plaintiff. Id. at 128. The district court observed that "Illinois law does not always require privity of contract between the user and the manufacturer of the product, at least insofar as the enforceability of implied warranties of merchantability and fitness for a particular purpose are concerned." Id. The district court then noted that the

Illinois court of appeals in *Frank's Maintenance* had recognized two exceptions to the privity requirement in implied warranty cases—the direct relationship exception and the third-party beneficiary exception. *Id.* (citing *Frank's Maint.*, 408 N.E. 2d at 412; *Rhodes Pharmacal Co. v. Continental Can Co.*, 219 N.E. 2d 726, 732 (Ill. App. 1966)).

Based on the complaint, the *Abco Metals* court found that a direct relationship between the manufacturer and plaintiff could be found from the allegations that (1) the manufacturer's engineer attended the meeting where the purchase of the wire chopper was discussed, and he promised that the machine would meet plaintiff's requirements; (2) plaintiff notified the manufacturer that the wire chopper did not operate as expected; (3) after such notification, the manufacturer assured plaintiff that the chopper would be fixed and appeared to take some steps to do so, although the attempted repairs failed. *Id.*

The district courts in *Elwood* and *Abco Metals* relied on *Frank's Maintenance* in determining that a direct relationship exception exists to the privity requirement. In *Frank's Maintenance*, the plaintiff, a manufacturer of motorcycle front fork tubes, ordered steel tubing from an intermediary seller, who ordered the product from the manufacturer and directed that it be sent directly to plaintiff. When the plaintiff discovered that the steel tubing was defective, it sued the intermediary seller and manufacturer for breach of implied warranty of merchantability. 408 N.E. 2d at 405-06. The manufacturer moved for summary judgment arguing that it could not be liable to plaintiff because it was not in privity with it. *Id.* at 412. The Illinois appellate court held that although implied warranties are usually not applicable between the buyer and a

remote manufacturer, that is not the case where a direct relationship exists between the manufacturer and the seller, or where, as in that case, "the manufacturer knew the identity, purpose and requirements of the dealer's customer and manufactured or delivered the goods specifically to meet those requirements." *Id.* (citing *Rhodes Pharmacal Co., Inc. v. Continental Can Co., Inc.* 219 N.E. 2d 726 (Ill. App. 1966)) (other citations omitted).   The court reached its conclusions based on its finding that the manufacturer was clearly aware that the order from the intermediary seller was on behalf of plaintiff and it shipped the order directly to the plaintiff. *Id.*

Based on its review of the Illinois case law, the Court predicts that Illinois would recognize a direct relationship exception to the privity requirement under the circumstances presented here.   The evidence here clearly supports a finding that a direct relationship existed between descote and PPG/Axiall.

First and foremost, this Court has found that FC Tech/Mark Fucich had apparent authority to act as descote's agent.   Therefore, FC Tech/Fucich's direct negotiations and communications with PPG/Axiall regarding the sales of the descote MOVs[26] are attributable to its principal, descote.   In addition, Richer made several trips with Fucich to PPG/Axiall's Lake Charles plant which produces chlorine and loads it into rail tank cars for transportation to is customers.   The evidence further shows that Fucich was

---

[26] For example, evidence in the record supports a finding that FC Tech was the facilitator of the sales of the descote MOVs, and was instrumental in facilitating PPG's desire to purchase these valves.  (11/11/15 Fucich Dep. at 57, Axiall App. Ex. D, ECF No. 270-1 at 34.)  The evidence also shows that the negotiations for the purchase of the descote MOVs by PPG were conducted by Julie Bart and Mark Fucich.  (Bart Aff. dated 10/26/17 at ¶ 20, Axiall App. Ex. S, ECF No. 304-19 at 4.)

approached by Reiner of The Chlorine Institute and Julie Bart of PPG/Axiall to ask if descote would manufacture a MOV similar to one produced by a competitor, and this was the impetus for descote's decision to manufacture the 922 valves.

Moreover, after it purchased the descote valves, PPG/Axiall continued to have direct communications with FC Tech and descote. (Bart Aff. dated 10/26/17 at ¶¶ 25-26, Axiall App. Ex. S, ECF No. 304-19 at 5; see also email correspondence among and between PPG/Axiall, descote, and FC Tech, Jan. 2013 to Feb. 2014, Axiall App. Ex. Y, ECF No. 304-25 at 2-8, 44-56, 82-108, 123-139, 189-218.) Fucich also trained Axiall's employees on the use and operation of the descote MOVs. When the valves failed to operate properly, Axiall contacted descote. Both Fucich and Richer conducted an investigation of the four damaged valves, and Fucich participated in the removal of the 922/926 parts and replaced all of the damaged parts in response to Axiall's first reported valve failure. Fucich also participated in a full examination of the four valve sets involved in the second reported valve failure by Axiall. Mr. Richer authorized FC Tech to engage the services of Stress Engineering Services to conduct an investigation as to why the springs of the MOVs cracked in service.

In addition, descote established that FC Tech was its exclusive distributor of its products in the United States and Canada, and descote and FC Tech selected Salco as the exclusive distributor of its descote MOVs in the transportation industry in the United States. Because of this structure established by descote, the only way for PPG/Axiall to receive the descote MOVs was through descote's agent, FC Tech, and

their U. S. distributor, Salco. Thus, direct shipment was impossible, and therefore, should not negate the application of the direct relationship exception.

Accordingly, the Court finds that the evidence clearly establishes that a direct relationship existed between descote and PPG/Axiall, thereby excusing the privity requirement, and no reasonable jury could find otherwise. Therefore, no conflict exists between Illinois and Pennsylvania law as to Axiall's breach of implied warranty claims against descote. As such, no further choice-of-law analysis is required.[27] At trial, the parties shall apply Pennsylvania law with regard to Axiall's breach of express and implied warranty claims.

Accordingly, the Court will deny descote's motion for summary judgment as to Axiall's implied warranty claims against it.

### 2. **Misrepresentation Claims**

Descote has moved for summary judgment on the issue of whether, as a matter of law, Axiall's claims for misrepresentation (Count IV) are barred by the economic loss doctrine.[28] Descote correctly observes that, under Pennsylvania law, "the economic loss doctrine has been construed to hold that negligence, strict products liability, fraud and negligent misrepresentation theories do not apply to actions between commercial

---

[27] In light of its conclusion with regard to the direct relationship exception, the Court need not address the two other exceptions that Axiall contends would be recognized by the Illinois courts.

[28] descote has moved for summary judgment on Count IV solely on the basis of an economic loss doctrine bar, and not on the basis of the particular elements of a common law tort claim for negligent or fraudulent misrepresentation. *See* Memorandum in Support of Motion for Summary Judgment ("Descote's Memo on Summary Judgment"), ECF No. 283, at 22.

enterprises where the only damages alleged are economic losses." *Partners Coffee Co., LLC v. Oceana Servs. & Prod. Co.*, 700 F.Supp.2d 720, 733 (W.D. Pa. 2010). Although Section 552 of the Restatement (Second) of Torts provides an exception permitting some negligent misrepresentation claims for purely economic loss, this Court concurs with Defendant descote that the Pennsylvania Supreme Court's limited adoption of Section 552, as set forth in *Bilt-Rite Contractors, Inc. v. The Architectural Studio*, 866 A.2d 270 (Pa. 2005), does not apply. The Court finds, in accordance with the language of other relevant District Court decisions, that the State Supreme Court's adoption of the Restatement (Second) of Torts, Section 552 extends an exception to the economic loss doctrine's bar of negligent misrepresentation claims only to those who "suppl[y] false information for the guidance of others" in the course of their "business, profession or employment", such as architects and accountants providing professional work product. *See* Section 552. This exception does not encompass manufacturers or their representatives/agents who allegedly supply misinformation in the form of transactional misrepresentation(s) as to a commercial product/subject of sale.[29] As to Axiall's claim of fraudulent misrepresentation, this Court is bound by the determination and prediction of Pennsylvania law made by the Court of Appeals for the Third Circuit in *Werwinski v. Ford Motor Co.*, 286 F.3d 661 (3d Cir. 2002). The Third Circuit assessed the split of authority among lower State courts and concluded that the Pennsylvania Supreme Court would apply the economic loss doctrine bar to claims for intentional

---

[29] As descote notes, the parties agree to the applicability of Pennsylvania law on this issue. *See* Descote's Memo on Summary Judgment, ECF No. 283, at 2.

fraud, with the narrow exception of claims for fraud-in-the-inducement not intertwined with any claims for breach of warranty - through which related claims should be "properly remedied". *Werwinski*, 286 F.3d at 680-81.[30]  This Court will therefore grant Defendant's motion as to Count IV, Axiall's misrepresentation claims.

(a)  Background

As noted *supra*, the March 12, 2015 Amended Complaint, ECF No. 9, includes allegations that Mark Fucich made misrepresentations as to both the appropriateness of the descote valves and their manufacturer's warranty.  Count IV alleges the elements of misrepresentation, *i.e.*, that Defendant knew or should have known said representations were false, that they were intended to induce purchase of the valves, that Axiall justifiably relied on said representations, and that "monetary damages resulted".  ECF No. 9, at paragraph 89.  Plaintiff makes further allegations, in subsequent pleadings and based on information obtained in the course of litigation, that descote made misrepresentations in its promotional literature including, *e.g.*, misrepresentations related to the purchased valves' appropriateness to Axiall's intended use.  *See* Axiall's Memorandum of Law in Opposition to Descote's Motion for Summary Judgment ("Axiall's Memo in Opposition to Summary Judgment"), ECF No. 305, at 11.  The Amended Complaint alleges "consequences" as costs of valve replacements, pressure plate installations, and tank car lease.  ECF No. 9, at paragraphs 57-65.  Axiall does not dispute that its losses were purely economic.  *See* ECF No. 305.

---

[30] The *Werwinski* plaintiffs brought claims for breach of express and implied warranty, fraudulent concealment and violations of Pennsylvania's Unfair Trade Practices and Consumer Protection Law (the "UTPCPL").  298 F.3d at 663.

(b)  Negligent Misrepresentation

Section 552(1), "Information Negligently Supplied for the Guidance of Others",

provides the following negligent misrepresentation exception to the economic loss

doctrine's bar:

> One who, in the course of his business, profession or employment, *or* in
> any other transaction in which he has a pecuniary interest, supplies false
> information for the guidance of others in their business transactions, is
> subject to liability for pecuniary loss caused to them by their justifiable
> reliance upon the information, if he fails to exercise reasonable care or
> competence in obtaining or communicating the information.

Restatement (Second) of Torts, Section 552(1) (emphasis added).

The Pennsylvania Supreme Court has adopted and applied this exception as to

the first category of information providers, *i.e.*, one who makes information

misrepresentation "in the course of his business, profession or employment".  Section

552(1).  *See Bilt-Rite*, 866 A.2d at 285-86 (holding that economic loss rule did not bar

contractor's negligent misrepresentation claim against architect, which was not defeated

by absence of privity of contract as circumstances gave rise to foreseeable duty, and

finding claim maintainable as a matter of law under Section 552, which Court was

"persuaded" to formally adopt "as applied by [cited sister] jurisdictions in the

architect/contractor scenario"); *id.* at 286 ("[W]e see no reason why Section 552 should

not apply to architects and other design professionals."); *id.* at 287 ("Accordingly, we

hereby adopt Section 552 as the law in Pennsylvania *in cases where information is*

*negligently supplied by one in the business of supplying information, such as an architect or*

*design professional*, and where it is foreseeable that the information will be used and

relied upon by third persons, even if the third parties have no direct contractual relationship with the supplier of information."*) (emphasis added); *id.* (further discussing rationale of "imposing such a duty upon design professionals").

A few years later, in affirming an economic loss doctrine bar to a negligent misrepresentation claim against a utility company, the Pennsylvania Supreme Court found the *Bilt-Rite* exception inapplicable because the defendant was not a "professional information provider" and not "in the business of providing information for pecuniary gain". *Excavation Techs., Inc. v. Columbia Gas Co. of Pennsylvania*, 985 A.2d 840, 843 (Pa. 2009). In so holding, the State Supreme Court further observed that the utility company was not "akin" to one who is paid for the professional service of preparing detailed information for a client's project. *See id.* Although there have been no subsequent relevant State Supreme Court decisions, the Pennsylvania Superior Court last September considered the *Bilt-Rite* exception's scope, and found that it should be read to encompass not only architect-contractors, but also accountants who are similarly "providing professional information". *Fulton Bank, N.A. v. Sandquist*, 2017 WL 4284923, at *8 (Pa. Super. Sept. 27, 2017); *id.* (citing with approval *Kirschner v. K&L Gates, LLP*, 46 A.3d 737, 741 (Pa. Super. 2012) (applying *Bilt-Rite* exception to law firm and investigating fraud company which were "professional firms in the business of supplying information").[31]

---

[31] Axiall overextends the analysis and holding of *Fulton* in asserting that it renders the *Bilt-Rite* exception "appropriate when the facts presented" show reliance on misinformation provided to potential customers in a commercial transaction, and the

Finally, as descote correctly notes, our sister Court for the Eastern District of Pennsylvania has repeatedly addressed application of the economic loss doctrine to negligent misrepresentation claims against manufacturers and other sellers of goods under Pennsylvania law. It has concluded that manufacturers, and their representatives/agents, are not subject to liability for negligent misrepresentation under the *Bilt-Rite* exception to the economic loss doctrine. *See, e.g.*, *Whitaker v. Herr Foods, Inc.*, 198 F.Supp.3d 476, 491-92 (E.D. Pa. 2016) (holding that manufacturer's provision of product information "ancillary to" sale "materially differ[ed] from the professional representations made by an accountant, lawyer or architect for pecuniary gain discussed in B*ilt-Rite*"); *Elliott-Lewis Corp. v. Skanska USA Bldg., Inc.*, 2015 WL 4545362, at *5 (E.D. Pa. July 28, 2015) ("A manufacturer and a manufacturer's representative are very different from [ ] accountants, lawyers and architects . . . . The sale of a product is fundamentally different than the sale of information, even if the seller provides information about the product to consummate the sale."); *Integrity Carpet Cleaning, Inc. v. Bullen Cos.*, 2011 WL 31397, at *4 (E.D. Pa. Jan. 5, 2011). *See also Partners Coffee*, 700 F.Supp.2d at 732-36.

(c)  Fraudulent Misrepresentation

As noted above, there are split opinions among the Pennsylvania lower courts on application of the economic loss doctrine to claims of intentional fraud. However, the Third Circuit reviewed and provided its expository analysis of these cases in *Werwinsk*.

---

cases Axiall cites in support are not analogous. *See* Axiall's Memo in Opposition to Summary Judgment, ECF No. 305, at 30-32.

*See* [286 F.3d at 675](#) (discussing cases and concluding: "We are satisfied from our review of the case law . . . that the law in Pennsylvania with respect to the application of the economic loss doctrine to intentional fraud actions remains unsettled, and the district court opinions interpreting Pennsylvania law on the point provide little guidance.").[32]

The *Werwinski* Court predicted that the Pennsylvania Supreme Court would apply the economic loss doctrine bar to claims of fraudulent misrepresentation and noted that "even if [the Court] were torn between two competing yet sensible interpretations of Pennsylvania law . . . [it] should opt for the interpretation that restricts liability . . . ." *Id.* at 680-81 (observing that "[t]he economic loss doctrine is designed to place a check on limitless liability for manufacturers and establish clear boundaries between tort and contract law").

The Third Circuit recognized a narrow exception for fraud-in-the inducement claims which are "extraneous to" those misrepresentations which "relate to the quality or character of the goods sold" which are "properly remedied through claims for breach of warranty". *Id.* at 676, 678.[33] This holding is binding on this Court.[34]

---

[32] Axiall errs in its assertion that "Pennsylvania courts generally recognize that the economic loss doctrine does not apply to fraudulent misrepresentation claims." Axiall's Memo in Opposition to Summary Judgment, [ECF No. 305, at 33](#) (citing *[David Pflumm Paving & Excavating v. Found Servs. Co., 816 A.2d 1164, n. 2 (Pa. Super. 2003)](#)*. Indeed, the Court in *Pflumm* expressly did not reach the issue. *See [id.](#)*

[33] *See also [Capricorn Power Co., Inc. v. Siemens Westinghouse Power Corp., 324 F.Supp.2d 731, 734–35 (W.D. Pa. 2004)](#)* (explaining that where "bargained for product" causes purely economic loss, "the law governing breach of warranty would be the appropriate cause of action") (citing *[REM Coal Co. v. Clark Equipment Co., et al., 563 A.2d 128 (1989)](#)*); *[id. at 742](#)* ("The Third Circuit's in depth analysis of the doctrine's application upheld the district court's finding that an exception for intentional fraud should not be found within the economic loss doctrine, where the Plaintiffs alleged fraudulent concealment

Axiall acknowledges that "[t]here is a limited exception" for only "extraneous" fraud claims under *Werwinski*, but asserts that the Court "should decline to apply the economic loss doctrine to Axiall's fraudulent misrepresentation claims against descote" because "there is no contract between" these particular parties and thus "no danger of confounding [their] contractual duties." ECF No. 305 at 34 (citing *Capricorn Power*, *supra*). The Court observes that "fraud in the inducement" claims speak to the negotiation and execution of a contract between the parties, while the misrepresentations alleged in the Amended Complaint were assertedly intended to induce product purchase and Axiall itself here asserts the absence of any contract between Axiall and descote. More importantly, the alleged misrepresentations in Count

---

of defective automotive parts in vehicles manufactured by Ford. In coming to this conclusion, the Third Circuit essentially agreed with the court in *Huron Tool & Engineering Co. v. Precision Consulting Services, Inc.*, 209 Mich. App. 365, 373, 532 N.W.2d 541, 545 (1995) which found an exception for fraud-in-the-inducement claims to the economic loss doctrine so long the 'fraud is 'extraneous to the contract,' not 'interwoven with the breach of contract.' *Werwinski* at 676.").

[34] Axiall's citation to *Sadler v. Balboa Capital Corp.*, 2012 WL 6591713 (W.D. Pa. Dec. 18, 2012) is misstated, as this Court declined to apply the economic loss doctrine where the claims of negligent and fraudulent misrepresentation were dismissed under the gist of the action doctrine. 2012 WL 6591713, at *4 ("Because I have already ruled that Counts II and III of Plaintiffs' complaint are barred by the gist of the action doctrine, I need not assess the applicability of the economic loss doctrine as to those Counts."). The Court notes that Count IV is purely a claim for misrepresentation. *Sadler* proceeded to analyze the plaintiff's separate claim for "fraud in the execution" (including allegations that the contract signatures were not plaintiff's), and declined "to extend the [economic loss] doctrine to intentional acts taken by one party to subvert the purpose of a contract." *Id.* at *5 (quoting *Price v. Freeze & Frizz Inc.*, 2009 WL 6602437 (Pa.C.C.P. Nov. 29, 2009) (citing *Smith Reinhart Ford*, 69 Pa. D. & C. 4th 432, 437 (Pa.C.C.P. 2004)). The facts at hand are distinguishable. *Cf.* Axiall's Memo in Opposition to Summary Judgment, ECF No. 305, at 33.

IV also underlie Plaintiff's breach of express warranty claims in Count I.  *See* Amended

Complaint, [ECF No. 9, at 3](#) ("descote Convinces PPG to Purchase Dual Valves . . ."); 8-9

(Breach of Express Warranty).  *See also id.* at 9-11 (Count II – Breach of Implied Warrant

of Merchantability; Count III – Breach of Implied Warranty of Fitness for a Particular

Purpose).  As the Third Circuit noted in *Werwinski*, when the Supreme Court adopted

the economic loss doctrine, it "observed that the need for a remedy in tort is reduced"

when "the customer has received 'insufficient product value'" and "explained that in

such a situation *express and implied warranties under contract law* are best suited to

compensate for a loss . . . ."  [286 F.3d at 671](#) (quoting *[East River S.S. Corp. v. Transamerica](#)

*[Delaval, Inc.](#)*, [476 U.S. 858, 872-73 (1986)](#) )(emphasis added); *[East River S.S.](#)*, [476 U.S. at](#)

[873](#) (holding that  damages available under "contract law, and the law of warranty in

particular" most naturally met subject claims for "purely economic loss").[35]

(d)  <u>Summation</u>

As analyzed at length in Section B(1), *supra*, this Court has concluded that "Axiall

appears to have a viable express warranty claim against descote under both Illinois and

Pennsylvania law" and will also deny descote's motion for summary judgment as to

Axiall's implied warranty claims against it.  Thus, in accordance with the Third Circuit's

holding on application of the economic loss doctrine in *Werwinski*, Axiall's claims for

---

[35]  *See also [East River](#)*, [476 U.S. at 868](#) (citing *[Seely v. White Motor Co.](#)*, [403 P.2d 145 (1965)](#)
which "held that preserving a proper role for the law of warranty precludes imposing
tort liability if a defective product causes purely monetary harm"); *[REM Coal](#)*, [563 A.2d](#)
[at 129](#) ("[C]ontract theories such as breach of warranty are specifically aimed at and
perfectly suited to providing complete redress in cases involving . . . economic losses.")
(quoted in *[Werwinski](#)*, [286 F.3d at 671](#)).

breach of warranty afford it a proper vehicle for remedy of the economic harm alleged.[36]  Plaintiff cannot seek to recover in tort economic losses to which its entitlement flows from breach of contract and/or breach of warranty; "express warranties and state warranty statutes can provide for compensation . . . regardless of whether the misrepresentation is innocent, negligent, or intentional."  _Werwinski_, 286 F.3d at 680.  Summary judgment is thus appropriate on Count IV seeking recovery for the same harm on the basis of tort liability for alleged negligent or fraudulent misrepresentations.[37]

---

[36] _Cf._ _DeFebo v. Anderson Windows, Inc._, 654 F.Supp.2d 285 (E.D. Pa. 2009) (dismissing misrepresentation claims under gist of the action doctrine, and intentional fraud claim under economic loss doctrine, where plaintiff also brought claims for breach of contract, breach of express warranty, and breach of implied warranties); _id._ 292-93  (rejecting plaintiff's contention that intentional fraud "generally alleged" under the UTPCPL was not barred and holding that, "despite seeming conflicting [subsequent] holdings", and whatever the merits of concerns expressed, the District Court is bound by the Third Circuit's prediction and interpretation of Pennsylvania law).

[37] _Cf._ _Stein v. Fenestra America, L.L.C._, 2010 WL 816346 (E.D. Pa.  Mar. 9, 2010) (dismissing negligent misrepresentation and/or fraudulent inducement claims against both defendants under economic loss doctrine and _Werwinsk_, where plaintiff maintained claim for breach of contract against window manufacturer, and claims for breach of express and implied warranties against manufacturer and intermediary entity, with which plaintiff had no contract but which also made alleged product misrepresentations which induced purchase); _id._ at *3-4 (rejecting plaintiff's attempt to "plead around the economic loss doctrine, which certainly applies to negligent misrepresentation claims" by asserting "fraudulent inducement" and holding that "the Third Circuit has predicted that the Pennsylvania Supreme Court would find the economic loss doctrine applicable" in the circumstances); _id._ at *5 (holding that "alleged fraud . . . is 'undergirded by factual allegations identical to those supporting their breach of contract counts'" and did not cause distinct harm) (quoting _Werwinski_ at 678).

### C.   ARI'S MOTION FOR SUMMARY JUDGMENT ON DESCOTE'S CROSS-CLAIM FOR CONTRIBUTION & INDEMNITY

In its Partial Motion for Summary Judgment as to descote's Cross-Claims for Contribution and Indemnity ("ARI's Motion on Cross-Claims"), ECF No. 276, ARI asks this Court to enter judgment in its favor on descote's cross-claims against it for contribution and indemnity.  ARI concedes in its Brief that if the Court grants summary judgment on descote's cross-claims, summary judgment should also be granted on ARI's own cross-claims for contribution and indemnity.  *See* Brief in Support of Partial Motion for Summary Judgment as to Descote S.A.S.' Cross-Claims for Contribution and Indemnity ("ARI's Brief on Cross-Claims"), ECF No. 277.  The Court concurs in this conclusion, and in ARI's focused and well-grounded analysis of the inapplicability of these cross-claims.   The Court turns first to the issue of contribution.

As well-summarized in ARI's Reply Brief in Support of its Partial Motion for Summary Judgment as to Descote S.A.S.' Cross-Claims for Contribution and Indemnity ("ARI's Reply Brief on Cross-Claims"), ECF No. 320, descote's cross-claim for common law contribution is unmaintainable under Pennsylvania law.  Contribution is governed by the Uniform Contribution Among Tort-Feasors Act ("UCATA") and permits contribution among joint tort-feasors, *i.e.*, "two or more persons jointly or severally liable *in tort* for the same injury to persons or property . . . ."  42 PA. CONS. STAT. § 8322 (emphasis added). *See also, e.g.*, *Voyles v. Corwin*, 441 A.2d 381, 383 (Pa. Super. Ct. 1982). Axiall has brought no tort claim against ARI, a fact which is determinative despite descote's assertions that Axiall *could* have made out a negligence or tort claim against

ARI; descote acknowledges, as it must, that Axiall did not. descote has no standing to bring Axiall's claims for it, and descote's assertion that the nature of a plaintiff's claims (*e.g.*, a limitation to contract and warranty), "should not bar [a defendant] from seeking the equitable remedy of contribution" mistakes fundamentals of the UCATA and related doctrine. *See* descote's Memorandum of Law in Opposition to ARI's Motion for Partial Summary Judgment on CrossClaims ("descote's Memo in Opposition on Cross-Claims"), ECF No. 307, at 5 n. 3. As explicated in ARI's Reply Brief on Cross-Claims, ECF No. 320, at 3-4, descote's citations to cases involving underlying tort claims against each defendant are simply inapposite.

Turning now to the issue of common law indemnification, the Court again concurs with ARI's summation of applicable law. *See* ARI's Reply Brief on Cross-Claims, ECF No. 320, at 4-5. As set forth above, Axiall has filed one (1) tort claim against descote for negligent misrepresentation and three (3) claims against descote for breach of express warranty, implied warranty of merchantability and implied warranty of fitness for a particular purpose. Common law indemnification is available for breach of contract where an express provision exists between the parties; as descote acknowledges, there is no such contractual provision between ARI and descote. *See Richardson v. John F. Kennedy Mem. Hosp.*, 838 F.Supp. 979, 990 (E.D. Pa. 1993); descote's Memo in Opposition on Cross-Claims, ECF No. 307, at 9. It is also available where a party's liability is solely secondary, *i.e.*, where it arises without fault because of a legal relationship to the party at fault; this is distinguished from actions in which – as here - the party's liability is based on its breach of a contract between that party and the

plaintiff.  See *Higgins Erectors & Haulers, Inc. v. E.E. Austin & Son, Inc.*, 714 F. Supp. 756, 759 (W.D. Pa. 1989); *Willet v. Pa. Med. Catastrophe Loss Fund*, 702 A.2d 850, 854 (Pa. 1997).

Axiall has raised separate claims predicated on separate acts of the Defendants, as to which ARI and descote may each raise defenses.  That ARI's improper manufacture of tank pressure plates caused a descote valve malfunction is an assertable defense, but descote errs in maintaining that contribution and/or indemnity apply between it and ARI.  Axiall's tort claim of negligent and/or fraudulent misrepresentation and contract-based claims of breach of warranty against descote arise directly from descote's alleged conduct, *i.e.*, from its own representations and undertakings; they are patently *not* secondary to ARI's conduct.  To the contrary, ARI's conduct did not contribute to any descote misrepresentation or undertaking, and ARI's performance of its undertakings is separate and distinct from whether descote made an actionable misrepresentation or whether its valve(s) conformed to descote's warranty.  These questions are evidentiary ones.[38]

Accordingly, the Court concludes that ARI is entitled to judgment as a matter of law on descote's cross-claims against ARI for contribution and indemnity.  Likewise, ARI's cross-claims against descote for contribution and indemnity fail, as a matter of

---

[38] descote's citation to a personal injury case imposing indemnification on a compressor manufacturer primarily responsible for the product's defect, which the secondarily-liable supplier failed to detect is, as ARI correctly observes, inapposite.  Axiall has not sued descote for failing to detect ARI's alleged tank misconstruction.  descote's Memo in Opposition on Cross-Claims, ECF No. 307, at 10 (citing *Tromza v. Tecumseh Prods.*, 378 F.2d 601 (3d Cir. 1967)); ARI's Reply Brief on Cross-Claims, ECF No. 320, at 4.

law, and therefore, descote is entitled to judgment in its favor on ARI's cross-clams against it.

### D.  ARI'S MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO AXIALL'S IMPLIED WARRANTY CLAIMS

In its Motion for Partial Summary Judgment as to Axiall's implied warranty claims ("ARI's Motion on Implied Warranty"), ECF No. 278, ARI asks this Court to enter partial summary judgment in its favor on the basis of the parties' contractual provisions.  Axiall concedes in its Brief the contract terms, including provisions of express warranty and disclaimer, but asserts (1) that it is nonetheless entitled to pursue breach of implied as well as express warranty under the language, or ambiguity created by the language, of contract paragraph 4, and/or (2) that paragraph 4's repair and replacement remedy has failed of its essential purpose, thus entitling Axiall to pursue implied warranty claims.  Because Axiall errs in its analysis, this Court will grant ARI's Motion on Implied Warranty, ECF No. 278, and enter judgment in favor of ARI on Counts VII (breach of implied warranty of merchantability) and VIII (breach of implied warranty of fitness for a particular purpose) of Axiall's Amended Complaint against ARI.[39]

ARI entered into a contract with Axiall pursuant to which ARI sold tank cars to Axiall.  The parties' written agreement (the "Agreement") is governed by its choice of

---

[39] As noted *supra*, Axiall has brought four (4) claims against ARI: breach of contract, breach of express warranty, breach of implied warranty of merchantability, and breach of implied warranty of fitness for a particular purpose.

Delaware law[40] and includes an express warranty together with an appropriately prominent disclaimer, in paragraph 3, of any implied warranties of merchantability or fitness for purpose. *See* ARI's Appendix of Exhibits, [ECF No. 287-6](#) (ARI's "Standard Terms and Conditions", which were expressly included in the parties' governing Agreement). *See* ARI's Concise Statement of Material Facts, [ECF No. 287, at paragraph 26](#) (quoting paragraph 3: "Subject to the limitations on remedies and liabilities set forth below, Builder warrants each Unit to be built in accordance with the Specifications therefore and, except for Parts (for which Builder makes no warranties whatsoever), to be free from defects in material and workmanship . . . ."). Pargraph 3, headed "Warranty", then goes on to provide, in capitalized letters and boldface, that: "Builder makes no other warranty and this warranty is in lieu of all other warranties, express or implied, including those of merchantability, fitness for a particular purpose and non-infringement." [ECF No. 287-6](#).[41]

The parties' Agreement also provides, at paragraph 4, headed "Builder's Liability and Buyer's Sole and Exclusive Remedy", that "Builder's sole and exclusive liability to Buyer and Buyer's sole and exclusive remedy against Builder for breach of

---

[40] *See* ARI's Concise Statement of Material Facts, [ECF No. 287, at paragraph 23](#) (citing the Agreement and Judge Conti's June 28, 2016 Opinion, [ECF No. 68](#)); *see also* [ECF No. 68 at 1](#) (citing Concise Combined Statement of Facts, [ECF No. 60](#)).

[41] *See also* [ECF No. 287 at paragraph 27](#) (quoting paragraph 3, disclaiming responsibility for loss/damage "due in whole or in part to commodities shipped in the Units" and stating that: "Builder makes no representation or warranty, express or implied, that the Unit is suitable for any commodity that may be shipped in it and Builder and Buyer expressly agree that, . . . , it is the sole responsibility of Buyer to ensure that the Specifications are satisfactory to cover all potential contingencies that may arise from the storage of products in, and/or the transportation of products by, railcar . . . .").

Builder's warranty or any other claims or causes of action against Builder . . . with respect to a delivered and accepted unit shall be limited to the prompt repair or replacement of any Unit found to be in breach of warranty, or, at Builder's option, a refund of the purchase price therefor."  ECF No. 287-6.  This paragraph further provides that: "If Builder fails to repair or replace a Unit in response to a valid warranty claim, Buyer may pursue a breach of warranty claim against Builder.  Under no circumstances shall Builder be liable for incidental, punitive, or consequential damages . . . ."  *Id.*[42]

ARI correctly invokes the contractual provisions, express warranty and disclaimer.  *See* ARI's Brief in Support of Partial Motion for Summary Judgment as to Axiall Corporation's Implied Warranty Claims ("ARI's Brief in Support on Implied Warrant"), ECF No. 279; *id.* at 1-2 ("Axiall ignores the very language negotiated and agreed upon by the parties . . . by pursuing claims specifically excluded by the contract terms.").  *See also id.* at 7-8 & nn. 4-6 (noting that sellers may disclaim warranties for merchantability and fitness for a particular purpose as specified under Delaware's codification of the Uniform Commercial Code ("UCC") at 6 Del. C. Section 2-316).

In response, Axiall does not dispute the written contract's express warranty or prominent disclaimer.  *See* Axiall's Memorandum of Law In Opposition to ARI's Partial Motion for Summary Judgment as to Axiall's Implied Warranty Claims ("Axiall's Opposition on Implied Warranty"), ECF No. 301.  But it makes two arguments.  First,

---

[42] *Cf.* ECF No. 68 at 3 (predicting that the Delaware Supreme Court "would conclude that under the Delaware UCC, a contractual provision barring a party's recovery of consequential damages should be independently interpreted and applied from the . . . provision permitting a party to recover all remedies provided for in the code when a limited remedy fails of its essential purpose").

Axiall seizes upon the provision in paragraph 4 that "[i]f [ARI] fails to repair or replace a Unit in response to a valid warranty claim, [Axiall] may pursue a breach of warranty claim against [ARI]." Axiall contends this language gives it a right to make a claim not only on breach of the express warranty actually made, but on disclaimed warranties as well, or that it creates an entitlement by ambiguity. *See* ECF No. 301 at 2. This assertion, to which Axiall devotes two paragraphs of analysis, is meritless; *i.e.*, it lacks textual, logical and jurisprudential support. *See* ECF No. 301 at 6-7. As noted above, ARI clearly set forth limited express warranty and disclaimer provisions in the Agreement's *warranty* paragraph; it was not incumbent on ARI to do so again in the *remedy* paragraph which immediately followed.

Second, Axiall contends that the limited remedy of repair and replacement in paragraph 4 fails of its essential purpose and that such failure eliminates the disclaimer of implied warranties.[43] But Axiall's proffered analysis (rather than the Agreement itself) conflates remedies with warranties.[44] Axiall cites Section 2-719(2) of the Delaware UCC: "[w]here circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy may be had as provided in this title." ECF No. 301 at 8. To begin with, the parties' agreement expressly provides for action for breach of warranty

---

[43] By Opinion of June 28, 2016, this Court held, in denying a motion for partial summary judgment by Axiall (ECF No. 47), that "there are material disputes of fact with respect to whether the limited remedy provided for in the contract entered into between [the parties] failed of its essential purpose" and indeed "whether the contract was breached in the first instance." ECF No. 68 at 2.

[44] *Cf.* EF No. 279 at 3 ("Like many commercial contracts, the Agreement between Axiall and ARI contains both limitations of liability and damage provisions . . . .").

upon failure of repair or replacement. It is doubtful the parties' agreed upon remedy can be deemed to have failed while that action is pending. In any event, the UCC provision broadening available remedies, *i.e.*, Section 2-719, cannot fairly be read to create additional warranties expressly disclaimed by contract.

The case Axiall strives to distinguish is, as ARI asserts, analogous. *See* ARI's Brief in Support on Implied Warranty, ECF No. 279 at 10-12 (providing a thorough and correct explication of *Lecates v. Hertrich Pontiac Buick Co.*, 515 A.23 163 (Del. Super. 1986)). In *Lecates*, the Court clearly distinguishes between modification of remedies and warranty disclaimers. In dismissing plaintiff's claims for breach of implied warranties and addressing the applicability of Section 2-719 to Section 2-316, the Court points out that if an implied warranty is effectively disclaimed in accordance with 6 Del. C. Section 2-316 (as here), there can be no breach of that warranty and therefore no need to analyze allowed remedies for such a breach. *See* 515 A.2d at 171-72 (discussing distinction and independence of Delaware UCC's provision for "Contractual modification or limitation of remedy" and that for "Exclusion or modification of warranties"); *id.* at 172 (quoting Comments to Section 2-719 stating that seller is free to disclaim warranties as provided in 2-316 and "[i]f no warranty exists, there is of course no problem of limiting remedies for breach of warranty"); ECF No. 279 at 10-11. *Compare* ECF No. 301 at 9 (ARI's reference to jury determination of "whether the repair and replacement warranty failed of its essential purpose").

The sound rationale of *Lecates* clearly applies to the facts *sub judice*. Axiall's contrary assertion - that ARI's reference to a breach of warranty remedy in paragraph 4

of the agreement precludes reliance on the *Lecates* distinction - is simply not tenable.  *See* ECF No. 301 at 8.   Axiall cites two cases from other jurisdictions:  *Trgo v. Chrysler Corp.*, 34 F.Supp.2d 581, 591 (N.D. Ohio 1998) and *John Deere Co. v. Hand*, 319 N.W.2d 434, 437 (Neb. 1982).  *See* ECF No. 301 at 8-9.  The Court observes that although these decisions indicate that the failure of a limited remedy's essential purpose vitiates a disclaimer of implied warranties, they do so without substantive discussion.  Indeed, *Hand* actually refers to breach of implied warranties as a "remedy", reflecting the Nebraska Court's confusion.  In short, this Court finds each decision unpersuasive as well as non-precedential.

The Court concurs with ARI's explication of the decision of the Delaware Superior Court in *Lecates*, and holds that the parties' contractual warranty disclaimer is valid and enforceable, and claims for breach of implied warranty brought by Axiall in Counts VII and VIII should be dismissed.

## IV.    CONCLUSION

For the reasons set forth above, the Court will:  (1) grant Axiall's motion for partial summary judgment against descote (ECF No. 268); (2) grant in part and deny in part descote's motion for summary judgment against Axiall (ECF No. 272)—the motion will be granted as to Axiall's misrepresentation claims and denied in all other respects; (3) grant ARI's motion for summary judgment (ECF No. 276) as to descote's cross-claims against it; (4) and grant ARI's motion for partial summary judgment (ECF No. 278) as to Axiall's implied warranty claims against it.   In addition, Court will dismiss ARI's cross-claims against descote.

An appropriate order will follow.

Dated:   January 30, 2018                           BY THE COURT:

<span> </span>

_____
LISA PUPO LENIHAN
United States Magistrate Judge

cc:      All Counsel of Record